The HAVASUPAI TRIBE, et
al., Plaintiffs,

v.

UNITED STATES of America, the Unit-
ed States Department of Agriculture,
Forest Service, et al., Defendants.

No. Civ. 88–971 PHX–RGS.

United States District Court,
D. Arizona.

April 18, 1990.

Joe E. Sparks, for plaintiffs.

Michael R. Arkfled, Gary B. Randall, Norman D. James, Lawrence E. Stevens, Brad Doores, for defendants.

## ORDER

STRAND, District Judge.

### I. INTRODUCTION

Plaintiffs, the Havasupai Tribe and individual members of the Tribe, seek judicial review of the final decision by the Chief of the Forest Service to approve a modified Plan of Operations (the "Plan") submitted by co-defendant Energy Fuels Nuclear, Inc. in October 1984, for the Canyon Uranium Mine located in the Kaibab National Forest near the Grand Canyon National Park. Defendants in this action are: the United States of America, The Department of Agriculture, Forest Service; the Secretary of Agriculture; Chief of the Forest Service; the Regional Forester of the Southwest Region; the Forest Supervisor of the Kaibab National Forest (collectively referred to as the "federal defendants"); Energy Fuels Nuclear, Inc. ("EFN") and Energy Fuels Exploration Company, a corporation (collectively referred to as "Energy Fuels"). Plaintiffs challenge the Forest Service's decision approving the Plan on four grounds. First, plaintiffs allege that the approval of the Plan by the Forest Service violates plaintiffs' first amendment rights to freely exercise their religion at the Canyon Mine site. Second, plaintiffs assert that the actions of both the Forest Service and EFN violate the plaintiffs' aboriginal right of access to the Canyon Mine site. Third, plaintiffs argue that the Forest Ser-

vice breached its fiduciary duties owed to the plaintiffs by failing to preserve plaintiffs' alleged right of access to the Canyon Mine site. Fourth, plaintiffs allege that the Environmental Impact Statement ("EIS") is deficient and fails to comply with the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA"). Plaintiffs seek declaratory and permanent injunctive relief under the first three claims, and on their fourth claim, request that the court declare the EIS inadequate and order the Forest Service to prepare an EIS in compliance with NEPA.[1]

The matter before the court has been extensively briefed and argued by the parties.[2] Having considered the Administrative Record, the memoranda of the parties and their positions at oral argument, the file in this matter, and the pertinent legal authority, the court now renders its decision.

## II. BACKGROUND

In October 1984, Energy Fuels Nuclear, Inc. submitted to the United States Forest Service, Kaibab National Forest, a Plan of Operations for the Canyon Mine site, pursuant to Forest Service regulations, 36 C.F.R. § 228, Subpart A. EFN's Plan proposed the development of a uranium mine on an unpatented mining claim located on the Tusayan Ranger District of the Kaibab National Forest in Coconino County, Arizona.

The Canyon Mine site is located on land which was part of the original Grand Canyon Forest Reserve established in 1893 pursuant to the Forest Reservation Act of 1891. In 1908, the area was incorporated into the Coconino National Forest. Between 1908 and 1934, the area in dispute underwent numerous administrative name changes, however, the area officially became part of the Kaibab National Forest in 1934. The Canyon Mine site is approximately thirty-five miles southeast and upstream from the Havasupai Reservation.

The Canyon Mine involves the underground mining of breccia pipe uranium deposits. The Canyon Mine site will require disturbance of approximately 17 acres for the mine shaft and surface facilities. EFN has conducted exploratory drilling on the site during the period between 1978–1985 (excluding 1979). *See generally,* V.4B–D.215–P.4664; *Id.* at P.4652 (affidavits setting out history of development at the Canyon Mine site).

The Havasupai are a federally recognized Indian Tribe who have made their home in and around the Grand Canyon located in Northern Arizona since before the first contact with Europeans.[3] It is undisputed that plaintiffs' aboriginal lands once encompassed the Canyon Mine site. Plaintiffs contend that the location proposed for the Canyon Mine is a sacred and religious place for the members of the Havasupai Tribe. Plaintiffs believe that complete development of the Canyon Mine will deny plaintiffs' access to their sacred site and destroy the very essence of their religious and cultural system. *E.g.,* V.2B–D.59–P.1827 (Transcript of Oral Presentation before the Deputy Regional Forester, May 14, 1987); V.3B–D.122–P.3137–3143 (Affidavit of Four Havasupai Tribe members); V.3D–D.176–P.3716–3825 (Transcript of Oral Presentation before the Chief of the Forest Service, February 25, 1987).

Following submission of the Plan by EFN, the Forest Service distributed more than 100 copies of the Plan to interested

---

1. By Order dated July 29, 1988, the court determined that review in this case would be limited to the administrative record. The federal defendants have filed 14 volumes comprising the administrative record. By Order dated September 8, 1988, the court denied plaintiffs' motion to produce, motion to take discovery, and motion to strike. The court granted plaintiffs' motion to establish a uniform system of citation to the record. Citations to the administrative record are to Volume—Document—Page (V.___–D.___–P.___).

2. The arguments were based upon the administrative record and the court took judicial notice of legislative history and various documents as they related to the legal arguments made by the parties.

3. For a detailed discussion on the history of the Havasupai Tribe, see *S. Hirst, Havsuw Baaja: People of the Green Blue Water (1985).*

parties. The Forest Service received over 200 letters in response to requests for written comment. Analysis of these comments and input from several public meetings made it clear there was substantial public concern and controversy about the proposal and its potential effects on the quality of the human environment. Consequently, the Forest Service, pursuant to NEPA, decided to prepare an EIS. The notice of the decision to prepare an EIS, which formally begins the scoping process, was published in the Federal Register on April 30, 1985. 50 Fed.Reg. 18281. Following the decision to prepare an EIS, the Forest Service distributed more than 2,000 scoping letters to federal, state, and local government agencies, Indian tribes, news media and other interested individuals in preparation for a public scoping session to be held in Flagstaff, Arizona, on May 15, 1985. As a result of the scoping process, the Forest Service identified the principal areas of concern to be addressed in the EIS.

The Forest Service prepared a draft EIS considering various alternatives and released it to the public for comment on February 28, 1986. The deadline for public comment was May 1, 1986. The Forest Service released a final EIS, which was revised to reflect the comments received on the draft EIS, on September 29, 1986. On September 26, 1986, Forest Supervisor, Leonard Lindquist, issued his Record of Decision documenting the approval of the modified Plan of Operations.

On November 10, 1986, following the issuance of the Record of Decision approving the modified Plan of Operations, plaintiffs and others filed a timely appeal from the Forest Supervisor's decision with the Regional Forester, pursuant to 36 C.F.R. § 211.18. Appellants also sought a stay of site preparation and drilling pending the appeal. On November 21, 1986, the Regional Forester, Sotero Muniz, stayed the drilling of the uranium mine pending appeal, but authorized commencement of the mine site preparation activities.

On February 17, 1987, the Forest Supervisor filed his responsive statement with the Regional Forester and the public. On August 28, 1987, the Regional Forester affirmed the Forest Supervisor's decision on the merits. On September 25, 1987, plaintiffs and others appealed from the Regional Forester's decision to the Chief of the Forest Service, pursuant to 36 C.F.R. § 211.18, and again sought a stay of drilling at the site. On October 22, 1987, the Chief of the Forest Service continued the stay that had been issued by the Regional Forester. On June 9, 1988, the Chief of the Forest Service issued his decision affirming the Regional Forester's decision of August 28, 1987. The Secretary of Agriculture decided neither to review the procedural appeal nor the appeal on the merits, so the Chief's decisions became the agency's final determination.

Plaintiffs brought the instant suit seeking review of the agency's final decision. Following a hearing on the plaintiffs' application for preliminary injunction on June 17, 1988, the parties stipulated and the court ordered that the stay entered by the Forest Service would remain in effect until the court rules on the merits of the controversy and thereafter until time for appeal has expired.

## III. EXTINGUISHMENT OF ABORIGINAL TITLE

■ Plaintiffs claim that they have a prior and superior right of access to their sacred site at the Canyon Mine site based on their aboriginal title which plaintiffs argue was preserved by the *Grand Canyon National Park Enlargement Act*, 16 U.S.C. § 228i (hereinafter the "GCEA"). Defendants assert that plaintiffs' reliance on the GCEA is misplaced and that there is no doubt that by the time the GCEA became law in January 1975, all interest of the Havasupai Tribe in any of the non-trust lands comprising the Kaibab National Forest, including the Canyon Mine site had been extinguished.

■ It is undisputed that plaintiff's aboriginal title once encompassed the area of the Canyon Mine site.[4] Aboriginal title is a

---

**4.** The Indian Claims Commission in 1968 determined that the aboriginal territory of the Hava-

**1478**

term of art used to describe an Indian possessory interest in land which Indians have inhabited since time immemorial. *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 234, 105 S.Ct. 1245, 1251, 84 L.Ed.2d 169 (1985) (citing Cohen, *Original Indian Title*, 32 Minn.L.Rev. 28 (1947)). The Supreme Court has consistently recognized the aboriginal rights of the Indians to their lands. The Indians right of occupancy is " 'as sacred as the fee simple of the whites.' " *Id.* at 235, 105 S.Ct. at 1251 (quoting *Mitchel v. United States*, 9 Pet. 711, 746, 9 L.Ed. 283 (1835)).

■ Aboriginal title is a permissive right of occupancy granted by the federal government. *United States v. Gemmill*, 535 F.2d 1145, 1147 (9th Cir.), *cert. denied*, 429 U.S. 982, 97 S.Ct. 496, 50 L.Ed.2d 591 (1976) (citing *Johnson v. McIntosh*, 21 U.S. (8 Wheat.) 543, 573–74, 5 L.Ed. 681 (1823) (Marshall, C.J.)). Aboriginal title may be extinguished by the federal government at any time, although an "extinguishment cannot be lightly implied in view of the avowed solicitude of the Federal Government for the welfare of its Indian wards." *Id.* at 1147 (quoting *United States v. Santa Fe P. R.R. Co.*, 314 U.S. 339, 354, 62 S.Ct. 248, 255, 86 L.Ed. 260 (1941)). Congress's power to extinguish aboriginal possession is supreme, "whether it be done by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise...." *United States v. Santa Fe Pacific R.R. Co.*, 314 U.S. at 347, 62 S.Ct. at 252 (citations omitted). Therefore, the issue is whether the Havasupai aboriginal title to the land, including the Canyon Mine site, has been extinguished.

■ The treatment of the land is instructive to the issue of extinguishment. The original Havasupai reservation had been created by executive order in 1880. In 1882, the Havasupai reservation was diminished in size by executive order to an

area of about 518 acres. The creation of an Indian Reservation, however, does not invariably extinguish aboriginal title to outlying areas. *United States v. Santa Fe P. R.R.*, 314 U.S. 339, 351–56, 62 S.Ct. 248, 253–56, 86 L.Ed. 260 (1941); *Gila River Pima–Maricopa Indian Community v. United States*, 494 F.2d 1386, 1389, *cert. denied*, 419 U.S. 1021, 95 S.Ct. 497, 42 L.Ed.2d 295 (1974). An action of extinguishment by executive action depends on the acquiescence of Congress for its efficacy. *United States v. Southern Pac. Transp. Co.*, 543 F.2d 676, 689 (1976).

The Canyon Mine site is located on ground that was part of the original Grand Canyon Forest Reserve established by presidential proclamation in 1893 pursuant to the Forest Reservation Act of 1891. In 1908, the area was incorporated into the National Forest System as part of the Coconino National Forest. The area officially became part of the Kaibab National Forest in 1934. Several courts have determined that the reservation of lands for forest purposes effectively extinguishes Indian title. *United States v. Pueblo of San Ildefonso*, 513 F.2d 1383, 1386, 1391–92, 206 Ct.Cl. 649 (1975); *Gemmill*, 535 F.2d at 1149.

■ In *Gemmill*, the Ninth Circuit determined that "any ambiguity about extinguishment that may have remained after the establishment of the forest reserves, has been decisively resolved by Congressional payment of compensation to the ... Indians for these lands." *Id.* at 1149. In the instant case, the final judgment entered by the Indian Claims Commission and payment of the judgment by Congress resolves any doubt that aboriginal title of the Havasupai Tribe was extinguished. In the Havasupai's petition to the Indian Claims Commission, the Havasupai asserted that the action of the United States barring the "... Tribe from its original territory after

supai had extended from the present boundary of the Hualapai Reservation on the west, the Bill Williams Mountain and San Francisco Peaks on the south, The Little Colorado River on the east and to the Colorado River on the north. Red Butte, just south of the Canyon

Mine site, is located approximately in the center of the Havasupai Tribe's former aboriginal territory. *The Havasupai Tribe, et al., v. United States*, 20 Ind.Cl.Comm. 210, 234 (1968) (Finding of Fact No. 11).

November 21, 1871, in establishing a Havasupai Reservation and in excluding the ... Tribe from that portion of the Havasupai country outside the said Reservation therefore constituted a wrongful taking of all rights, title and interest in the said land belonging to the ... Tribe." *The Havasupai Tribe v. United States,* Docket No. 91 (Jan. 22, 1951); Hearing exhibit # 13 at ¶ 41. The Commission did not have the power to extinguish aboriginal title, but was a mechanism set up by Congress to make determinations of whether title had, in fact, been extinguished. The Commission determined that "by establishing a reservation for the [Havasupai] on June 8, 1880 and March 3, 1882, the United States wrongfully took [Havasupai] aboriginal title lands without payment of compensation therefor...." *The Havasupai Tribe v. United States,* 20 Ind.Cl.Comm. 210, 220 (1968); Hearing exhibit # 15. The determinations of the Commission in establishing the taking date should be given great weight if reasonable. *Pueblo of San Ildefonso,* 513 F.2d at 1391. In *Gemmill,* the Ninth Circuit recognized the difficulty of establishing the exact date on which Indian title has been extinguished. 535 F.2d at 1149. The Ninth Circuit's conclusion, which is equally applicable to the instant case where counsel went through the various actions in detail, is that "[a]ny one of these actions examined in isolation, may not provide an unequivocal answer to the question of extinguishment." *Id.* However, the actions by the federal government which culminated in the payment of the compromise settlement agreement show that the aboriginal title of the Havasupai has been extinguished. *See id.* Because of the payment of the compromise settlement by Congress, the court need not set an exact date for extinguishment of the Havasupai Tribes aboriginal title. The court simply recognizes that prior to the enactment of the GCEA, the Havasupai had no aboriginal title in the lands encompassing the Canyon Mine site.

Plaintiffs rely on the *Examiners' Report on Tribal Claims to Released Railroad Lands in Northwestern Arizona,* (May 24, 1942); Hearing exhibit # 4, for their proposition that Havasupai aboriginal title and the right of use had not been extinguished prior to enactment of the GCEA. The purpose of the examination was to determine whether and to what extent any of the lands released to the Santa Fe Pacific Railroad Company were subject to outstanding occupancy or other rights. It is undisputed that the land under scrutiny in the *Examiners' Report* did not concern the land which now comprises the Canyon Mine site. Plaintiffs contend that the analysis of their aboriginal title is applicable to the instant case. The examiners were of the opinion that no such extinguishment of aboriginal title had occurred. *Id.* at 49. The *Examiners' Report,* however, predates the Indian Claims Commission created by Congress in 1946, the final judgment entered by the Commission in 1969, and the *Gemmill* decision and *United States v. Dann,* 873 F.2d 1189, 1194 (9th Cir.1989). In light of the foregoing extinguishment analysis, the court finds that the Examiners' conclusions are not applicable to the instant litigation.

Most recently, the Ninth Circuit reaffirmed these principles in *United States v. Dann,* 873 F.2d 1189 (9th Cir.1989). There, the Ninth Circuit stated where a claim has been paid pursuant to a determination by the Indian Claims Commission, "we cannot avoid the rule of *Gemmill* that payment for the taking of a aboriginal title establishes that title has been extinguished." *Id.* at 1194.

■ The Supreme Court left open the issue of individual aboriginal title. *Id.* at 1193 (citing *United States v. Dann,* 470 U.S. 39, 50, 105 S.Ct. 1058, 1064, 84 L.Ed.2d 28 (1985). At oral argument, plaintiffs contended that they could establish individual aboriginal title based upon *Dann* and *Cramer v. United States,* 261 U.S. 219, 43 S.Ct. 342, 67 L.Ed. 622 (1923), but the court declined to permit the presentation of evidence on this issue. The Administrative Record indicates that the plaintiffs' claims have been based on their status as Havasupai Indians. The Record fails to reflect any claim of individual aboriginal rights to the Canyon Mine site. The plaintiffs raised the issue after the issuance of *Dann* on

January 11, 1989. The discussion in *Dann,* however, is instructive on this issue. The Ninth Circuit noted that no individual claim had been made. 873 F.2d at 1196. However, the Court of Appeals noted that no remnants of tribal title can survive thereafter in individual tribal members. *Id.* This court agrees. The Court of Appeals then focused on a narrower view of individual aboriginal title as discussed in *Cramer. Id.* at 1197. In *Cramer,* three Indians had occupied 175 acres of public land for years prior to the United States grant of a patent to a railroad. 261 U.S. 219, 43 S.Ct. 342. The Supreme Court upheld their title to the land actually enclosed and occupied by the individual Indians. *Id.* at 234–36, 43 S.Ct. at 346–47. The Ninth Circuit's analysis of *Cramer* reveals that the decision was based upon a federal policy at the time to favor "land settlement in general and Indian occupancy in particular." 873 F.2d at 1197. The Ninth Circuit noted that the policy of public lands settlement underlying *Cramer* no longer exist. *Id.* at 1198. An Indian cannot gain a right of occupancy simply by occupying public lands. *Id.* Even accepting the religious significance and use of the site by the individual Indians (as set forth in the Record and the Offer of Proof), the court finds that this does not amount to actual possession of the Canyon Mine site to the exclusion of all others. *See id.* at 1199.

 Plaintiffs contend that 25 U.S.C. § 194 is applicable in this matter and that defendants have failed to carry their burdens of production and persuasion. The court finds and concludes that this statute is inapplicable since aboriginal title had been extinguished. Furthermore, the term "white person" does not include the United States. *See Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 99 S.Ct. 2529, 61 L.Ed.2d 153 (1979) (Section 194 does not apply against a sovereign state). Alternatively, the defendants have carried any burden that section 194 imposes through their extinguishment arguments.

Accordingly, the court finds and concludes that plaintiffs aboriginal title to the lands encompassing the Canyon Mine site was extinguished prior to the enactment of the *Grand Canyon National Park Enlargement Act of 1975.*

## IV. LEGAL BARRIERS TO PLAINTIFFS' CLAIMS

 Defendants also contend that plaintiffs are barred by statute and by principles of res judicata and collateral estoppel from asserting the present claims of right of access. Congress created the Indian Claims Commission to hear and determine all Indian claims against the federal government accruing as of the date of the Act. *The Indian Claims Commission Act of 1946,* 25 U.S.C. § 70 *et seq.* (terminated on Sept. 30, 1978). The purpose of the Act was to provide a forum in which Indian tribes could present "all their claims of every type and variety" against the federal government. Congress vested the ICC with jurisdiction "[b]road enough to include all possible claims." *White Mountain Apache Tribe v. Clark,* 604 F.Supp. 185, 187 (D.Ariz.1984), *aff'd,* 784 F.2d 921 (9th Cir.), *cert. denied,* 479 U.S. 1006, 107 S.Ct. 644, 93 L.Ed.2d 700 (1986) (quoting Act of August 13, 1946, Pub.L. No. 726, 1946 U.S. Code Cong.Serv. (60 Stat.) 1347, 1355).[5]

5. The language of the 25 U.S.C. § 70a, in part, illustrates the breadth of the jurisdiction:

 The Commission shall hear and determine the following claims against the United States on behalf of any Indian Tribe, band or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska: (1) claims in law or equity arising under the Constitution, laws, treaties of the United States, and Executive orders of the President; (2) all other claims in law or equity, including those sounding in tort, with respect to which the claimant would have been entitled to sue in a court of the United States if the United States was subject to suit; (3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity; (4) claims arising from the taking by the United States, whether as a result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant; and (5) claims based upon fair and honorable

Based upon the grant of jurisdiction of the Act as well as its legislative history, all claims arising prior to 1946 were to have been brought before the Indian Claims Commission or were forever barred. *Id.* at 187 (citing 60 Stat. 1049, 1052); *Navajo Tribe of Indians v. New Mexico,* 809 F.2d 1455, 1464–66 (10th Cir.1987); *Temoak Band of Western Shoshone Indians v. United States,* 593 F.2d 994, 998, 219 Ct.Cl. 346, *cert. denied,* 444 U.S. 973, 100 S.Ct. 469, 62 L.Ed.2d 389 (1979).

In *White Mountain Apache Tribe,* the Indian tribe brought suit alleging that an 1887 survey erroneously excluded certain acreage from their reservation. The Tribe petitioned the ICC for redress for alleged wrongs committed by the United States; namely loss of property. The ICC determined that title outside of the reservation was extinguished. A stipulated settlement in the amount of $4.9 million dollars was reached between the Indian tribe and the United States. The court determined that under the principles of res judicata, the Indians' present claim was either settled or foreclosed by the earlier proceedings initiated by the ICC. 604 F.Supp. at 187–89.

Similarly, the Havasupai petitioned the Indian Claims Commission alleging that the United States had wrongfully deprived the Havasupai of their aboriginal lands. *See The Havasupai Tribe v. United States,* 20 Ind.Cl.Comm. 210 (1968); Hearing exhibits # 13 and # 15. The Indian Claims Commission concluded that the Havasupai did not voluntarily abandon any of their aboriginal lands. *Id.* at 220; Hearing exhibit # 15. Further, the ICC determined that the United States wrongfully took the Havasupai aboriginal title without payment of compensation when the government established a reservation for the Havasupai by the Executive Orders of June 8, 1880 and March 3, 1882. *Id.* at 220, 234–35. The Indian Claims Commission entered final judgment, incorporating a stipulated agreement between the Havasupai and the United States, awarding the Havasupai the sum of $1,240,000. *The Havasupai Tribe v. United States,* 21 Ind.Cl.Comm. 324, 341

dealings that are not recognized by any exist-

(1969); Hearing exhibit # 16. The United States made payment of the awarded compensation to plaintiffs within the meaning of the Indian Claims Commission Act, 25 U.S.C. § 70u(a). *See* Act of December 26, 1969, Pub.L. 91–166, ch. 9, 83 Stat. 447; Act of September 29, 1972, Pub.L. 92–438, 86 Stat. 741. Payment occurred, for purposes of this litigation, when Congress authorized and appropriated said payment. Whether the Indians accept payment is not determinative. *United States v. Dann,* 470 U.S. 39, 44, 105 S.Ct. 1058, 1061, 84 L.Ed.2d 28 (1984).

Section 70u(a) of the Indian Claims Commission Act is a statutory bar which provides that "The payment of any claim, after its determination in accordance with this chapter, shall be a full discharge of the United States of all claims and demands touching any of the matters involved in the controversy." In this case, the court finds and concludes that the plaintiffs' current right to access claim "touches" a matter involved in the prior case before the Indian Claims Commission because the Canyon Mine site is within the area of land that was in controversy during those proceedings involving the Havasupai.

Plaintiffs assert that the ICC did not provide a forum for the plaintiffs to bring the present action against private parties such as Energy Fuels for allegedly wrongful future actions. This approach fails to recognize that by the time of the ICC's determination, plaintiffs' aboriginal title had been extinguished. Thus, plaintiffs cannot avoid the statutory bar, as well as the principle of res judicata. The plaintiffs' claim may also be barred under the principles of collateral estoppel. *See Oglala Sioux Tribe v. Homestake Mining Co.,* 722 F.2d 1407, 1413 (8th Cir.1983) (ICC decision bars Oglala Sioux Tribe from relitigating whether previous Congressional act extinguished rights in their former aboriginal territory.)

The Havasupai also expressly stipulated that the Tribe would be barred from asserting any claim with respect to their aborigi-

ing rule of law or equity.

nal land, including claims which they could have, but did not assert.

> Entry of final judgment in said amount shall finally dispose of all rights, claims or demands which the petitioner has asserted or could have asserted with respect to subject matter of Docket No. 91, and petitioner shall be barred thereby from asserting any such right, claim or demand against defendant in any future action. 21 Ind.Cl.Comm. at 337.

Plaintiffs point to another provision in the stipulation which states that:

> The final judgment entered pursuant to this stipulation shall be by way of compromise and settlement and shall not be construed as an admission by either party, for the purposes of precedent or argument, in any other case. *Id.* at 337.

Plaintiffs contend that the stipulation as well as any reference to the ICC opinions cannot be used as they are not part of the Administrative Record. The court agrees that the stipulation cannot be used as a factual admission by the plaintiffs in this matter. The ICC proceedings, however, are an appropriate subject for judicial notice and are material to this case as they pertain to the defendants' legal arguments concerning extinguishment (i.e., claim was made and claim was paid concerning plaintiffs' aboriginal territory). *See Gemmill,* 535 F.2d at 1149; *Dann,* 873 F.2d at 1194.

Accordingly, the court finds and concludes that plaintiffs' present action, based on its assertion of aboriginal title, is statutorily barred by 25 U.S.C. § 70u and barred by the principles of res judicata due to the final judgment and payment of the compensation in the proceeding before the Indian Claims Commission.

## V. INTERPRETATION OF THE GRAND CANYON ENLARGEMENT ACT

■ Plaintiffs' position is that the first and only act of Congress extinguishing Havasupai aboriginal title was the *Grand Canyon National Park Enlargement Act of 1975,* 16 U.S.C. § 228i. Plaintiffs assert that the GCEA extinguished all of the rights of the Havasupai in their aboriginal title except one. Plaintiffs analysis relies heavily, in the first instance, on the supposition that aboriginal title had not been extinguished prior to the enactment of the GCEA. The court, however, has determined that the plaintiffs' aboriginal title was extinguished prior to the GCEA. *See supra* Sec. III.

Plaintiffs argue that section 228i(c) specifically preserves a right of access to sacred religious places such as the Canyon Mine site. The court disagrees. Section 228i(c) provides, in part, that:

> Nothing in Section 228a–228j of this title shall be construed to prohibit access by any members of the Tribe to any sacred or religious places or burial grounds, native foods, paints, materials and medicines located on public lands not otherwise covered in Section 228a to 228j of this title.

The court has reviewed the Grand Canyon Enlargement Act and its legislative history. First, the legislative history reveals that the Havasupai Tribe sought enlargement of their reservation to include lands that did not include the lands encompassing the Canyon Mine site. *See Hearing Exhibits # 17–18.* Second, the legislative history reveals that Congress did discuss and debate the issue of extinguishment of the Havasupai aboriginal title in light of the Indian Claims Commission determination. Third, whether or not aboriginal title of the Havasupai had previously been extinguished was not a necessary finding with respect to the action taken by Congress in passing the GCEA. Fourth, Congress could and did enlarge the Havasupai reservation. Fifth, the language upon which plaintiffs rely does not create an affirmative right of access.

The main focus of the GCEA was to increase the size of the Grand Canyon National Park and secure its beauty and splendor for generations to come. *See* 16 U.S.C. § 228a–228j; 120 Cong.Rec. H10436–10437 (Oct. 11, 1974). Within this context, the problem of the Havasupai Tribe came to the forefront. *E.g.,* 120 Cong.Rec. S8523–8524 (May 20, 1974) (statement of Sen. Goldwater); 120 Cong. Rec. S11443 (June 25, 1974) (statement of

Sen. Humphrey). The legislative history reveals that much debate was had on whether or not to increase the size of the Havasupai reservation to include approximately 251,000 acres desired by the Tribe, which represented the lands that they were then using for grazing as allowed under Section 3 of the Act of February 26, 1919. *E.g.*, 120 Cong.Rec. H10435–10450 (Oct. 11, 1974).

The legislative history reflects that Congress did debate whether or not the Havasupai's aboriginal title had been extinguished by the 1969 settlement before the ICC. *See* 120 Cong.Rec. H6683–6684 (July 17, 1974) (statement of Rep. Udall). However, such a determination was not necessary, as Congress had the power to enlarge the reservation: "Whether or not title was extinguished when the reservation was created, there is no doubt that the Congress can enlarge any Indian reservation, if it chooses to do so, by setting aside lands belonging to the United States in trust for the use of the tribe." *House Committee on Interior and Insular Affairs, Report with Dissenting and Additional Views on S.1296*, Report No. 93–1374, at 9 (Sept. 25, 1974); *see, also*, 120 Cong.Rec. H10444 (statement of Rep. Foley); ("Congress has the responsibility and the power to create, add to or abolish Indian reservations as it sees fit.... The question here is one of need, and the committee concluded that the tribe indeed needs a larger land base.") *Id.* at 10440 (statement of Rep. Udall) The legislative history reflects a concern on behalf of some members of Congress that expansion of the Havasupai Reservation would undermine the entire process under the Indian Claims Commission. 120 Cong. Rec. H10449–10450 (statement of Rep. Dellenback); *Id.* at H10450 (statement of Rep. Taylor). The legislative history reflects the fact that the ICC paid the compensation for the Tribe's .aboriginal lands, but allowed them to use the area they now sought for an enlarged reservation for grazing purposes. *House Committee on Interior and Insular Affairs, Report with Dissenting and Additional Views on S.1296*, Report No. 93–1374, at 9. The situation of the Havasupai appeared to be unique to other claims settled by the ICC and would not create a dangerous precedent to claims by other Indian Tribes. *See id.* at 10; 120 Cong.Rec. H10440 (statement of Rep. Udall); 120 Cong.Rec. H6684 (July 17, 1974).

Congress declared that an additional 185,000 acres were to be held in trust enlarging the reservation of the Havasupai Tribe. 16 U.S.C. § 228i(a). Congress, however, did place various restrictions on the Havasupais' use of the land consistent with the Congressional intent to preserve the splendor of the Grand Canyon. *See id.* at § 228i(b). Congress also designated 95,300 acres as Havasupai use lands for grazing and other traditional purposes. *Id.* at § 228i(e). In reference to the use area, the legislative history recognizes that "this area contains places of historic significance to the tribe, as well as burial grounds and religious shrines, the Committee agreed that access within the area should be guaranteed for tribal members." *House Committee on Interior and Insular Affairs, Report with Dissenting and Additional Views on S.1296*, Report No. 93–1374, at 10. It is undisputed that neither the enlarged reservation or designated use lands encompass the Canyon Mine site.

An examination of the language in section 228i(c), which plaintiffs rely upon, indicates that Congress did not create, preserve, or confirm any affirmative right to access. The parties have not presented, and the court is unable to find, any legislative history concerning the relevant part of section 228i(c) which supports the plaintiffs' interpretation. Section 228i(c) clearly indicates that the Grand Canyon Enlargement Act shall not be construed to prohibit access. There is no part of the GCEA which prohibits plaintiffs' access to the Canyon Mine site. The language in section 228i(c) is a statement of statutory neutrality to judges, administrative agencies, and others not to interpret the GCEA to prohibit access on other public lands. Such a statement of statutory neutrality is particularly appropriate in light of the past friction between the Havasupai and some agencies of the federal government. *See,*

*e.g.*, 120 Cong.Rec. S7554, 7555 (statement of Sen. Kennedy); 120 Cong.Rec. Extension of Remarks in the House (July 8, 1974) (editorial from the Los Angeles Times); 120 Cong.Rec. H6684 (July 17, 1974) (statement of Rep. Udall); 120 Cong.Rec. H10440 (Oct. 11, 1974) (statement of Rep. Udall); V.3D–D.172 (p. 166)–P.3633.

A review of other sections of the GCEA support the court's determination that section 228i(c) does not create an affirmative right of access. Congress knew how to create land in trust for the benefit of the Havasupai. Section 228i(a) provides that Lands "are hereby declared to be held by the United States in trust for the Havasupai Tribe." Congress also knew how to create a right of access. The sentence immediately preceding the disputed sentence in § 228i(c) states that: "the Secretary shall have the right of access to any lands hereby included in the Havasupai Reservation." No similar grant in trust or affirmative right of access is created by the language plaintiff cites. Plaintiffs also analogize the language contained in the GCEA to extinguishment of title and preservation of rights in the Massachusetts and Connecticut Indian Land Claims Acts, 25 U.S.C. § 1771; 25 U.S.C. § 1751. In those acts, however, Congress did not preserve aboriginal rights, but only personal claims of individual Indians. It is also interesting to note that in those acts the reservation occurred in the same clause as the extinguishment. In the GCEA, the language that plaintiffs assert support a grant of reservation does not appear in the same subsection of the GCEA that addresses extinguishment. This further supports an interpretation against creation of an affirmative right of access.

The language of § 228i(c) neither acknowledges or preserves an aboriginal right in any non-trust land or defines a trust responsibility on the part of the United States.

This interpretation is further supported by the fact that intense debate occurred at the time of the GCEA on whether to give the Havasupai Tribe any additional lands at all. In light of the debate on whether to give the Havasupai lands in trust at all, this court cannot infer that Congress intended to give the Havasupai a power that would amount to a veto over activities on public lands not otherwise covered by the act.[6] The area which plaintiffs claim a right to access covers over three million acres. There is no indication that Congress intended to prohibit such activities as mining throughout this area. *See Pathfinder Mines Corp. v. Hodel*, 811 F.2d 1288, 1291 (9th Cir.1987).

Based upon the analysis in Sections III, IV, and V of this Order, the court finds and concludes that plaintiffs do not have an aboriginal right of access to the Canyon Mine site. Plaintiffs cannot prevail on their claim of right of access as set forth in their Complaint. Accordingly, judgment shall be entered in favor of defendants on Count II of plaintiffs' Complaint.

## VI. FOREST SERVICE APPROVAL OF THE PLAN OF OPERATIONS FOR THE CANYON MINE DOES NOT VIOLATE THE PLAINTIFFS' FIRST AMENDMENT RIGHT TO FREE EXERCISE OF RELIGION

The Havasupai assert that the Forest Service's decision approving the modified plan of operations for the Canyon Uranium Mine violates their first amendment rights to freely exercise their religion at the Canyon Mine site. The Havasupai assert that the Canyon Mine site is sacred and any mining will interfere with their religious practices at and near the mine, will kill their deities, and destroy their religion or "Way." *E.g.*, *Complaint*, at 7–11; V.2B–D.59–P.1827 (Transcript of Oral Presentation before the Deputy Regional Forester, May 14, 1987); V.3B–D.122–P.3137–3143 (Affidavit of Four Havasupai Tribe

---

**6.** The practical effects of accepting the Havasupais' interpretation of the GCEA would be immense and unpredictable. Plaintiffs have thousands of other religious sites in their former aboriginal title land not otherwise covered by

the GCEA, which the Havasupai will generally not reveal to non-Havasupai members. *See* V.3D–D.176–P.3766 (Comments of Tribal Chairman, Mr. Wayne Sinyella).

members); V.3D–D.176–P.3716–3825 (Transcript of Oral Presentation before the Chief of the Forest Service, February 25, 1987). For purposes of this section of analysis, the court can assume that all of plaintiffs' assertions about the religious sanctity of the Canyon Mine site and adverse affects upon the Havasupai belief system are true.[7]

The case of *Lyng v. Northwest Indian Cemetery Protective Association,* 485 U.S. 439, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988) is applicable to the instant case and is dispositive of plaintiffs' first amendment claim. In *Lyng,* the Forest Service had prepared a final environmental impact statement for a proposal allowing logging in, and construction of a six-mile paved road through the Chimney Rock section of the Six Rivers National Forest in California. It was undisputed that insofar as Indian religious practices were concerned the proposed actions would have severe adverse, if not devastating effects. *Id.* at 451, 108 S.Ct. at 1326. The Supreme Court assumed that for purposes of their decision the government's action would "virtually destroy the Indians' ability to practice their religion." *Id.* (quoting the Ninth Circuit's opinion). Further, the Supreme Court recognized that the traditional religious practices were intimately bound up with the unique features of the Chimney Rock area and that the government's action would physically destroy those environmental conditions. *Id.* The Supreme Court determined that the "Constitution simply does not provide a principle that could justify upholding" the Indians' first amendment claims. *Id.* at 452, 108 S.Ct. at 1326–27. Similarly, in the instant case, the Forest Service's approval of the Plan does not violate the free exercise clause of the first amendment.

Plaintiffs here, as in *Lyng,* assert that their religious and cultural belief systems are intimately bound up with the Canyon Mine site. Plaintiffs assert their belief that EFN's operations will destroy their

religion. The Supreme Court, in *Lyng,* made the same assumption in reaching its conclusion of no first amendment violation. Accordingly, the court finds and concludes that no first amendment violation is present in this case.

Plaintiffs attempt to distinguish *Lyng* on several grounds, all of which the court finds to be unavailing. First, plaintiffs argue that coercion is present in this case as the Canyon Mine site is the embodiment and center of the Havasupai Tribe universe. The court finds no distinction from *Lyng* which necessitates a different result. The majority specifically rejected the dissent's balancing approach, noting the practical impossibility of determining the centrality of a religious belief. *Id.* at 457–58, 108 S.Ct. at 1329–30. The Supreme Court did not find governmental coercion which implicated a "compelling justification" test. On this subject the Court stated:

> This does not and cannot imply that incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs, require government to bring forward a compelling justification for its otherwise lawful actions. The crucial word in the constitutional text is "prohibit": "For the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government.

*Id.* at 451, 108 S.Ct. at 1326 (quoting *Sherbert v. Verner,* 374 U.S. 398, 412, 83 S.Ct. 1790, 1798, 10 L.Ed.2d 965 (1963) (Douglas, J., concurring)).

The court can find no meaningful distinction between this case and *Lyng.* Plaintiffs are not penalized for their beliefs, nor are they prevented from practicing their religion.[8]

---

7. Plaintiffs submitted a general offer of proof regarding the Havasupai religion on May 17, 1989.

8. The Havasupai do not necessarily have to be present at the Canyon Mine site to practice their religion. The "Way" is a state of mind—a reli-

gious or spiritual journey. V.3B–D.122–P.3139–40; "Our physical presence at the sacred places is not always required." *Id.* at P.3139. "Sometimes we go to this place to pray.... Sometimes we pray for that place from a distance." *Id.* at 3141.

Second, plaintiffs argue that *Lyng* should be distinguished because this case involves private mining activities while *Lyng* involved the building of a road by the government. As in *Lyng*, however, fee title of the land in this case remains with the government. *Union Oil Co. of California v. Smith*, 249 U.S. 337, 349, 39 S.Ct. 308, 311, 63 L.Ed. 635 (1919). "Whatever rights the Indians may have to use the area ... those rights do not divest the Government of its right to use what is, after all, *its* land." *Lyng*, 485 U.S. at 453, 108 S.Ct. at 1327. Moreover, the Havasupai apparently have thousands of other religious sites within their former aboriginal lands. V.3D–D.176–P.3766. Giving the Indians a veto power over activities on federal land that would "easily require de facto beneficial ownership of some rather spacious tracts of public property." *Id.* at 453, 108 S.Ct. at 1327.

Finally, plaintiffs argue *Lyng* is distinguishable because there the Indians still had access to their religious site, where in the instant case, the mining laws give EFN the right to possession and exclusion of the Havasupai. Plaintiffs point to the fence and no trespassing signs at the Canyon Mine site in support of their claim that they are denied access to the site. There is no evidence in the record, however, to show the plaintiffs have been denied reasonable access to the Canyon Mine site, that they have been treated any differently than the general public, or that any mining law has been applied against plaintiffs in a discriminatory manner. The court recognizes that plaintiffs' access to the Canyon Mine site may be different from what they would like; however, any limitation does not amount to a violation of the first amendment.

This case is simply not distinguishable from *Lyng*. Plaintiffs cannot prevail on their claim based upon the free exercise clause of the first amendment. Accordingly, judgment will be entered in favor of the defendants on Count I of plaintiffs' Complaint.

## VII. FOREST SERVICE APPROVAL OF THE PLAN OF OPERATIONS FOR THE CANYON MINE DID NOT VIOLATE ANY FIDUCIARY DUTY OF THE GOVERNMENT TO THE HAVASUPAI

Plaintiffs contend that the Forest Service failed to recognize and consider the government's fiduciary duty to the Havasupai in reviewing EFN's plan of operations throughout the administrative process. The court disagrees. The Deputy Regional Forester stated that:

Federal agencies may have statutorily established fiduciary duties associated with the management of Indian lands and resources. No such duties are at issue here since the lands embraced within EFN's mining claims are National Forest System lands, not Indian lands. There is nothing in the record to support appellant's contention that the development and operation of the Canyon Mine on National Forest System land will have a deleterious effect on the Reservation....

V.4A–D.256–P.5234; *see, also,* V.5–D.256–P.5234 (concurrence by Chief in decision on the merits). Furthermore, the Forest Service concluded that it "has met any fiduciary duty it may have through the exhaustive analysis undertaken for the Canyon Mine and the imposition of extensive monitoring, mitigation and reclamation measures." V.4A–D.256–P.5234.

It is undisputed as a general principle that the federal government has broad fiduciary obligations to the Indian tribes akin to that of a guardian and a ward. *E.g., Seminole Nation v. United States*, 316 U.S. 286, 296–97, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480, 1777 (1942); *Vigil v. Andrus*, 667 F.2d 931, 934 (10th Cir.1982); *Crain v. First National Bank*, 324 F.2d 532, 535 (9th Cir.1963). Any federal government action is subject to the government's general fiduciary responsibilities toward the Havasupai Tribe. *See Nance v. Environmental Protection Agency*, 645 F.2d 701, 711 (9th Cir.), *cert. denied,* 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981). It is equally clear that the federal

government is not obligated to provide particular services or benefits, nor to undertake any specific fiduciary responsibilities in the absence of a specific provision in a treaty, agreement, executive order, or statute. *Vigil,* 667 F.2d at 934; *North Slope Borough v. Andrus,* 642 F.2d 589, 611 (D.C.Cir.1980); *Gila River Pima–Maricopa Indian Community,* 427 F.2d 1194, 190 Ct.Cl. 790 (1970). Plaintiffs allege that the specific fiduciary duty arises in the instant case from: (1) the Treaty of Guadalupe Hidalgo; (2) the American Indian Religious Freedom Act ("AIRFA"); (3) the GCEA; and (4) the government's general course of dealing with the Indians.

### A. The Treaty of Guadalupe Hidalgo

 The governments of the United States and Mexico signed the Treaty of Guadalupe Hidalgo ("the Treaty") on February 2, 1848 ceasing hostilities between the two nations. 9 Stat. 922 (1848). Relying on *United States v. Abeyta,* 632 F.Supp. 1301 (D.N.M.1986), plaintiffs contend that this Treaty secures them the religious right of access to the Canyon Mine site. Article IX of the Treaty states:

> Mexicans who, in the territories aforesaid, shall not preserve the character of citizens of the Mexican republic, conformably with what is stipulated in the preceding article, shall be incorporated into the Union of the United States, and be admitted at the proper time (to be judged of by the Congress of the United States) to the enjoyment of all the rights of citizens of the United States, according to the principles of the constitution; and in the mean time shall be maintained and protected in the free enjoyment of their liberty and property, and secured in the free exercise of their religion without restriction.

There is no dispute that the members of the Havasupai Tribe were citizens of the Mexican Territory at the time the Treaty was entered in 1848. In *Abeyta,* a member

of the Isleta Pueblo was charged with the knowing possession of parts of a golden eagle, without a permit, in violation of the Bald Eagle Protection Act. 632 F.Supp. at 1302. The use of eagles and their feathers in religious ceremonies constituted an indispensable part of an Indian ritual. *Id.* at 1303. The District Court for the District of New Mexico determined that the Bald Eagle Protection Act did not repudiate the guarantee of religious freedom under the Treaty of Guadalupe Hidalgo. The district court considered the Treaty as an international compact securing religious freedom to Mexican citizens in the ceded territories. *Id.* at 1306. The district court concluded that it was up to Congress to abrogate the Treaty. *Id.* at 1306–07. In light of the fiduciary relationship to the Indians, the district court determined that Congress did not intend to repudiate the protections the court believed had been created by the Treaty. *Id.* at 1306–07.

This decision from the District Court for the District of New Mexico is not binding upon this court, nor does this court find it to be persuasive. First, the validity of the decision is questionable in light of *United States v. Dion,* 476 U.S. 734, 106 S.Ct. 2216, 90 L.Ed.2d 767 (1986). In *Dion,* the Supreme Court concluded that a treaty [9] with the Yankton Sioux Tribe did not protect an Indian from prosecution under the Bald Eagle Protection Act. *Id.* at 743, 106 S.Ct. at 2222. *See, also, U.S. v. Thirty Eight Golden Eagles,* 649 F.Supp. 269, 277–278 (D.Nev.1986) (holding, contrary to *Abeyta,* that Bald Eagle Protection Act not facially unconstitutional burden to Indian's right to free exercise of religion) The second and more compelling reason, however, is the plain language of the Treaty of Guadalupe Hidalgo itself. The Treaty guaranteed the residents of what is now Arizona and New Mexico, formerly of Mexico, the right to "free exercise of their religion without restriction" until they became "incorporated into the Union of the United

---

**9.** The treaty at issue in *Dion* was an 1858 treaty to hunt the bald or golden eagle on the Yankton Reservation. The Supreme Court determined that the Bald Eagle Protection Act abrogated any Indian treaty rights. The Supreme Court,

of course, was not faced with the Treaty of Guadalupe Hidalgo, nor did it reach the issue of whether the Bald Eagle Protection Act was read to abrogate religious treaty rights. *See id.* at 746, 106 S.Ct. at 2223.

**1488**

States." Thereafter they would be entitled to "the enjoyment of all the rights of citizens of the United States, according to the principles of the constitution." The Treaty, by its own terms, does not create any right beyond the constitutional religious freedom rights. The Treaty simply affords those rights to residents in the area prior to statehood. The court finds and concludes that no specific fiduciary duty is created by the Treaty of Guadalupe Hidalgo.

B. *American Indian Religious Freedom Act—(AIRFA)*

▇▇▇▇ Plaintiffs reliance on AIRFA is misplaced. AIRFA provides that it is:

The policy to the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian ... including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites.

42 U.S.C. § 1996. AIRFA does not create a cause of action or any judicially enforceable rights. *Lyng*, 485 U.S. at 455, 108 S.Ct. at 1328. In an attempt to distinguish *Lyng*, plaintiffs assert that the plaintiffs in *Lyng* brought a separate count under AIRFA, while here, the Havasupai claim is related to a breach of a fiduciary duty. Plaintiffs purported distinction is unavailing.[10] The court agrees that AIRFA does impose an obligation on a federal agency to protect Indian religious freedom. However, AIRFA does not create a specific fiduciary relationship or the obligations imposed by such a fiduciary relationship. *Wilson v. Block*, 708 F.2d 735, 745–47 (D.C. Cir.), *cert. denied*, 464 U.S. 956, 104 S.Ct. 371, 78 L.Ed.2d 330 (1983) and 464 U.S. 1056, 104 S.Ct. 739, 79 L.Ed.2d 197 (1984). AIRFA requires a federal agency to evaluate their policies and procedures with the aim of protecting Indian religious freedom, to refrain from prohibiting access, possession and use of religious objects and the performance of religious ceremonies, and to consult with Indian organizations in regard to the proposed action. AIRFA does not require Indian traditional religious considerations to always prevail to the exclusion of all else. 708 F.2d at 745–46. AIRFA requires the federal agency to consider, but not necessarily defer to Indian religious values. It does not prohibit agencies from adopting land uses that conflict with traditional Indian religious beliefs or practices. *Id.* at 747. An agency undertaking a land use project will be in compliance with AIRFA if, in the decision-making process, it obtains and considers the views of Indian leaders, and if, in project implementation, it avoids unnecessary interference with Indian religious practices. *Id.* at 747.

▇▇▇▇ The court finds and concludes that the Forest Service has fulfilled its obligations to the Havasupai Tribe under AIRFA through its undertakings during the NEPA process.

C. *Grand Canyon National Park Enlargement Act—(GCEA)*

▇▇▇ As previously discussed, *see supra* V., the GCEA does not create a right of access for the plaintiffs to the Canyon

---

**10.** The bill's sponsor, representative Udall called it "'a sense of Congress joint resolution,' aimed at ensuring that 'the basic right of the Indian people to exercise their traditional religious practices is not infringed without a clear decision on the part of Congress or the administrators that such religious practices must yield to some higher consideration.'" *Lyng* at 456, 108 S.Ct. at 1329, (*citing* 124 Cong.Rec. 21444 (1978)). Representative Udall emphasized that the bill would not "confer special religious rights on Indians," would "not change any existing State of Federal law," and in fact, "has no teeth in it." *Id.* Plaintiffs assert that the Forest Service did not make a clear decision that the Havasupai religious concerns must yield. AIR-

FA does not declare an overriding federal policy to protect Indian religions or grant a veto over agency action. *Wilson v. Block*, 708 F.2d 735, 746 (D.C.Cir.), *cert. denied*, 464 U.S. 956, 104 S.Ct. 371, 78 L.Ed.2d 330 (1983) and 464 U.S. 1056, 104 S.Ct. 739, 79 L.Ed.2d 197 (1984). The Forest Service made considerable effort to gain information from the Havasupai. The Forest Service considered the information it did receive. EFN cannot deny reasonable access to the public, including the Havasupai. The Forest Service is required, to the extent possible, to avoid unnecessary interference with the Havasupai during the operation of the mine. AIRFA requires no more.

Mine site. Accepting plaintiffs' interpretation of the GCEA would be a prerequisite to its assertion that the statute creates a fiduciary duty toward the Havasupai. Since the court has found that no right of access was reserved to the Havasupai Tribe in the GCEA, the court finds and concludes that no fiduciary duty is created thereby.

### D. General Government Fiduciary Duty

■ Plaintiffs also assert a fiduciary duty based upon a general course of dealing between the United States and the Havasupai. In *Nance v. Environmental Protection Agency*, 645 F.2d 701 (9th Cir. 1981), the Ninth Circuit examined similar fiduciary duty claims. There, the Environmental Protection Agency ("EPA") had approved the Northern Cheyenne Tribe's redesignation of its Reservation from a Class II to Class I air quality standard. The Crow Tribe challenged the EPA approval of the redesignation as not considering the effects of the action upon their reservation. The Ninth Circuit stated, however, "that adequate procedures were provided by the Clean Air Act and the EPA regulations to fulfill this responsibility." *Id.*

Similarly, the court finds that the Forest Service satisfied any general fiduciary duty it may have had to the Havasupai Tribe by complying with the NEPA statute and regulations, as discussed below.

In conclusion, the court finds and concludes that the grounds set out by the Havasupai fail to establish the violation of government fiduciary duty or responsibility to the Indian tribe. Accordingly, judgment shall be entered in favor of defendants on Count III of plaintiffs' Complaint.

## VIII. THE NATIONAL ENVIRONMENTAL POLICY ACT CLAIM

The National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.* seeks "to declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man...." *Id.* § 4321; *see, also,* § 4331 ("Congressional declaration of national environmental policy"). The goal of the NEPA is to ensure that federal agencies carefully consider the environmental consequences of actions they undertake. The NEPA process requires an agency to take certain steps in evaluating the potential impacts of proposed actions, including the preparation of an Environmental Impact Statement ("EIS") under certain circumstances. *Id.* at § 4332 (requirements of a federal agency in fulfilling this national policy); 40 C.F.R. § 1501. The procedures set forth in regulations promulgated by the Counsel on Environmental Quality at 40 C.F.R. §§ 1500–17. ("CEQ Regulations")[11] implement the NEPA requirements. As discussed, the Forest Service decided to prepare an EIS and gave formal notice of the decision on April 30, 1985.

■ The established procedures for EIS preparation require four basic steps: (1) "scoping"; (2) data gathering and publication of a draft EIS; (3) public comment on the draft EIS; and (4) publication of the final EIS and "Record of Decision."[12] The purpose of an EIS is to both "provide decisionmakers with enough information to aid in the substantive decision whether to proceed with the project in light of its environmental consequence, and to provide the public with information and an opportunity to participate in gathering information." *Citizens for a Better Henderson v. Hodel*, 768 F.2d 1051, 1056 (9th Cir.1985). The fact that an EIS discloses that a proposition may have some adverse effects on the environment or human health does not necessarily indicate a violation of NEPA. *See, e.g., id.* at 1058. An EIS need not discuss remote and conjectural environmental con-

**11.** The relevant CEQ Regulations during 1985 and 1986 (as well as the present regulations) are the same.

**12.** For a concise summary of these steps, *see Memorandum of Energy Fuels Nuclear, Inc. and Energy Fuels Exploration Company in Support of Motion for Summary Judgment and Statement of Facts,* at 45–46.

sequences. *See, e.g., Sierra Club v. Hodel,* 544 F.2d 1036, 1039 (9th Cir.1976), but only every reasonable alternative. *Citizens for a Better Henderson,* 768 F.2d at 1057.

 While the NEPA does set forth significant substantive goals for the federal government, the duties imposed upon an agency are "essentially procedural." *Strycker's Bay Neighborhood Council v. Karlen,* 444 U.S. 223, 227, 100 S.Ct. 497, 500, 62 L.Ed.2d 433 (1981). The NEPA does not impose any substantive requirements or priorities upon agencies, and does not restrict the decisions or choices that an agency makes so long as the decision is fully informed and well considered. *Id.* at 227–28, 100 S.Ct. at 500.

 Before the court for review is the Forest Service's approval of EFN's Modified Plan of Operations. Plaintiffs have exhausted their administrative remedies. Judicial review of the Forest Service's decision is governed by the standards set out in the Administrative Procedure Act, 5 U.S.C. § 706. Accordingly, a reviewing court cannot impose its judgment on an agency.[13] The proper role for the court is to ensure that the Forest Service adequately considered and disclosed the environmental impact of its action, that its decision was not arbitrary and/or capricious. *Id.; see, also, Baltimore Gas & Electric Co. v. N.R.D.C.,* 462 U.S. 87, 97, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983). The adequacy of an EIS depends upon whether it was prepared in observance of the procedure required by law. 5 U.S.C. § 706(2)(D); *Animal Defense Council v. Hodel,* 840 F.2d 1432, 1435–36 (9th Cir. 1988); *State of California v. Block,* 690 F.2d 753, 761 (9th Cir.1982). The Ninth Circuit has adopted a "rule of reason," test that requires inquiring into whether an EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences, and whether the EIS's form, content and preparation foster both informed decisionmaking and

informed public participation. Once satisfied that the agency has taken this procedural and substantive "hard look" at environmental consequences in the EIS, the court's review is at an end. *Animal Defense Council* at 1435–36; *State of California v. Block* at 761.

Within this framework of review, the Havasupai Tribe alleges that the EIS prepared by the Forest Service is deficient and fails to comply with the procedural requirements of NEPA. Specifically, the Havasupai Tribe alleges that the EIS for the Canyon Uranium Mine: (1) fails to consider the "no-action alternative" of not approving the Plan of Operations for the mine; (2) fails to give adequate consideration to the plaintiffs' religious and cultural interests in the site; (3) is based on incomplete hydrogeological information; (4) fails to adequately consider the environmental impact of disposal of radioactive waste; and (5) fails to adequately consider the environmental cumulative impacts of mining in the region in which the Canyon Mine is located. If the EIS fails to comply with NEPA, the court must remand the case to the Forest Service for such further action as may be necessary to comply with the statute. The court will discuss each of these issues in turn.

## A. The No–Action Alternative

 NEPA requires that an EIS provide information in detail and consider every reasonable alternative to the proposed action. *Citizens for a Better Henderson,* 768 F.2d at 1057; *see* 42 U.S.C. § 4332(2)(c)(iii). The analysis of the varying alternatives constitutes the heart of the EIS. The CEQ Regulations contemplate that an EIS will include a no-action alternative to permit the agency and the public to address the option. 40 C.F.R. § 1502.14(d). In the instant case, the Forest Service selected five alternatives, including the no-action alternative.

---

**13.** "NEPA was designed 'to insure a fully informed and well considered decision,' but not necessarily, 'a decision the judges of the Court of Appeals or of this Court would have reached

had they been members of the decision making unit of the agency.'" *Strycker's Bay,* 444 U.S. at 227–28, 100 S.Ct. at 500.

The Havasupai Tribe alleges that the Forest Service never considered any alternative other than approval of the Canyon Uranium Mine. Plaintiffs allege that the entire EIS process was used as a means to justify an end. *See* 40 C.F.R. § 1502.2(g) (EIS shall assess environmental impact of proposed agency actions, rather than justifying decisions already made.). The basis for plaintiffs' assertion consists of alleged statements by Dennis Lund, the Forest Supervisor who had primary responsibility in drafting the EIS. Plaintiffs contend that Mr. Lund stated that the Forest Service was going to approve the Plan of Operations because it did not have legal authority to deny it. *See* V.2A–D.30–P.1051, 1053 (March 13, 1985 letter from Joe P. Sparks to Dennis Lund).[14] The court finds, however, that the Forest Service considered the no-action alternative in a manner consistent with established law and procedures and did not use the NEPA process to justify a decision already made.

The Formal Notice in the Federal Register which initiated the scoping process indicates a "range of alternatives for the development of the proposed mine including, but not limited to, approval of the proposal, approval of the proposal with specific mitigation measures and no-action, will be considered." V.2A–D.37–P.1222, 50 Fed.Reg. 18,281. Moreover, the Forest Service clearly described it's approach to the no-action alternative in the final EIS:

> The No–Action Alternative, for the purposes of this environmental evaluation, would involve disapproval of the Plan of Operations for the Canyon Mining Project. The plan would be returned stating the reasons for disapproval and request the proponent to submit a new plan that would meet the environmental and administrative constraints. While the Forest Service can require or impose

reasonable environmental controls or conditions on an operating plan, they do not have the authority to disapprove a reasonable operating plan for a mining operation which will be conducted in a reasonable and apparently environmentally responsible manner (re: General Mining Law and 36 C.F.R. 228). The use of this alternative, however, is consistent with previous Forest Service administrative decisions to treat the no-action mining alternative as the no project option. It provides a sound baseline against which all other options can be compared. V.1B–D.3–P.513.

The draft EIS stated that "[t]he Forest Service does not have the authority to categorically deny operations proposed under the mining laws." V.1A–D.1–P.24. The final EIS states that the Forest Service is without authority to deny "a reasonable operating plan for a mining operation which will be conducted in a reasonable and apparently environmentally responsible manner." V.1B–D.3–P.513; *see, also,* V.2A–D.37–P.1168 (Forest Supervisor's responsive statement to the Uranium Mine Appeal).

In direct response to a comment of the Havasupai Tribe on the draft EIS, the final EIS provides:

> We agree that the range of alternatives to be considered is not limited by the agency's authority. Thus, the EIS includes the No–Action Alternative … The consideration of the No–Action Alternative was expanded in the final EIS. However, it would be inaccurate if the EIS did not reflect to some extent the rights of a mining claimant under the General Mining Law and recognize some limits on Forest Service discretion when reviewing a Plan of Operations. The No–Action Alternative is fully considered

---

**14.** The March 13, 1985 letter states that: "The Tribe disagrees with your statement made in a conversation with Margaret Vick of our office on February 13, 1985, that the alternative of no mining is not available." V.2A–D.30–P.1051, 1053. In addition, Mr. Lund was quoted in several newspaper articles as saying that the alternative of no mine was not viable because of legislation passed by Congress. V.2B–D.62–

P.2038 (Williams News, Thursday, March 7, 1985); *Id.* at P.2041 ("Wolf's Den" by Dave Wolf, Arizona Wildlife News, March 1984, at p. 7); *Id.* at P.2053 (Williams News, Thursday, March 24, 1985). Those same newspaper articles encourage interested parties to submit written comments on the mine proposal to the Forest Service.

and evaluated. However, the EIS properly notes the limitations in implementing that alternative. V.1B–D.4–P.774. (Final EIS appendix 6, Public Comment and Forest Service Response).

 The court finds that the Forest Service properly recognized its authority and limitations in evaluating the no-action alternative. This conclusion is implicit in both the draft and final EIS. The Regional Forester explicitly made this apparent point in his decision on the merits of the appeal from the Forest Supervisor's September 29, 1986 decision. The Regional Forester stated that:

> The Forest Service does have the authority to disapprove *unreasonable* plans of operations and, thereby, to implement the no-action alternative. If all, or portions of a plan of operations do not contain reasonable requirements for surface resource protection, and the operator is unwilling or unable to make the necessary changes, then the Forest Service has the authority to disapprove all, or portions, of the plan.

V.4A–D.188–P.3943 (emphasis added). The Forest Service cannot categorically deny an otherwise reasonable plan of operations. *United States v. Weiss*, 642 F.2d 296 (9th Cir.1981). Of course, the Forest Service would have the authority to deny an unreasonable plan of operations or a plan otherwise prohibited by law. *E.g.*, 16 U.S.C. § 1538 (endangered species located at the mine site.). The Forest Service would return the plan to the claimant with the reasons for disapproval and request submission of a new plan to meet the environmental concerns. V.1B–D.3–P.513.

In *Weiss*, the owners of unpatented mining claims had been enjoined for failure to comply with Forest Service regulations by not filing an approved plan of operations. The Ninth Circuit affirmed the injunction. The Ninth Circuit noted that "[m]ining has been accorded a special place in laws relating to public lands." 642 F.2d at 299. As long as prospectors complied with the federal and state laws, "locators of mining locations were given 'the exclusive right of possession and enjoyment of all the surface included within the lines of their location,' along with the subsurface rights." *Id.* (quoting 30 U.S.C. § 26).

The Ninth Circuit also recognized an important interest in preserving and protecting the forests and parks on the public lands. *Id.* The Ninth Circuit stated that "the important interests involved here were intended to and can coexist." *Id.* With respect to the Secretary of Agriculture's authority and responsibility to maintain and protect the national forest lands, the Ninth Circuit stated:

> While prospecting, locating, and developing of mineral resources in the national forests may not be prohibited nor so unreasonably circumscribed as to amount to a prohibition, the Secretary may adopt reasonable rules and regulations which do not impermissibly encroach upon the right to the use and enjoyment of placer claims for mining purposes.

642 F.2d at 299 (footnote omitted). *See, also,* 16 U.S.C. § 478; 30 U.S.C. § 21a.

 The court's review of the record reflects that the Forest Service properly considered the no-action alternative as one of five alternatives in the EIS. The no-action alternative meant disapproval of the Plan of Operations and no mine. V.1A–D.1–P.51 (DEIS). The NEPA does not expand the authority of the Forest Service to include rejection of an otherwise reasonable plan of operations. *Cf. Cape May Green, Inc. v. Warren*, 698 F.2d 179, 188 (3d Cir.1983). The Forest Service was required to compare the no-action alternative with the beneficial and adverse impacts of the other alternatives. *See Kilroy v. Ruckelshaus*, 738 F.2d 1448, 1453 (9th Cir.1984); "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations," 46 Fed.Reg. 18027 (March 17, 1981) (When agency under court order or legislative command to act, the no-action alternative "provides a benchmark to compare magnitude of environmental effects of action alternatives.").

The Forest Service was also required by regulation to describe the existing environment. 40 C.F.R. § 1502.15. The Forest

Service recognized that the environmental effect of the no-action alternative envisioned leaving the environment in its unaltered natural state. V.1A–D.1–P.119 (DEIS). The Forest Service acknowledged that many groups, including the Havasupai Tribe, expressed interest in the no-action alternative during the scoping process. *See* V.2C–D.62–P.1996 (Analysis of Public Comment Relating to Canyon Mine). The no-action alternative was denominated as "Alternative # 1." V.1B–D.3–P.513 (FEIS); V.1A–D.1–P.51 (DEIS). Chapter 3 of the draft EIS includes a 39–page description of the existing environment, which in this instance also effectively describes the effect of selecting the no-action alternative. V.1A–D.1–P.79–117. Chapter 4 of the draft EIS discusses the environmental consequences of all alternatives, including further discussion of the no-action alternative. *Id.* at P. 119, 123, 126.

Plaintiffs and others commented on the no-action alternative. Appendix "G" to the final EIS includes the "no-action" comment letters received by the Forest Service on the draft EIS and the Forest Service's analyses of and responses to these letters. V.1–D.4–P.702–04; *Id.* at P.750; *Id.* at P.751; *Id.* at P.769, 773–74. Of the 238 letters received by the Forest Service, 74 letters, some with multiple signatures, opposed the mine altogether preferring Alternative # 1. *Id.* at P.694. The Forest Service's responses to each comment that addressed the no-action alternative reflect its detailed consideration of the alternative. The "Comparison of Alternatives" section in Chapter 2 of the final EIS depicts in eight tables the effect of selecting Alternative # 1 and evidences the detailed consideration of each alternative. V.1B–D.3–P.535–46. The responsiveness of Alternative # 1 to the resolution of each of the various identified "issues and concerns" was also discussed in the final EIS. V.1B–D.3–P.547–50; *Id.* at P.477–80 (summary).

The Forest Service properly utilized the no-action alternative as a baseline for comparison of the other alternatives. The Forest Service responded to comments on it. In light of the reasonableness of the plan of operation, the Forest Service correctly approved a modified plan of operations submitted by EFN.[15]

Plaintiffs also assert some miscellaneous violations. Plaintiffs contend that EFN has enclosed the mine yard with a fence and posted it against trespassing. Plaintiffs argue that this construction violates 40 C.F.R. § 1502.2(f) which states that agencies "shall not commit resources prejudicing selection of alternatives before making a final decision." The court finds and concludes that no violation has occurred nor has any action been taken that would prejudice the administrative or judicial decisionmaking process. The court finds and concludes that the agency treatment of the no-action alternative was reasonable and the Forest Service has taken the requisite "hard look." *See Animal Defense Council*, 840 F.2d at 1435–36.

*B. Consideration of the Havasupai Religious Concerns*

 NEPA requires that the environment considered by the federal agency include not only such traditional environmental concerns as water and air quality, but also the historic cultural and natural aspects of our national heritage, in order to preserve an environment which supports diversity and variety of individual choice. 42 U.S.C. § 4331(b)(4). The Havasupai Tribe concedes that the Forest Service, in response to plaintiffs comments on the draft EIS, added religious concerns to the issues evaluated in detail in the final EIS. V.1B–D.3–P.472 (FEIS); *Id.* at D.6–P.919 (Record of Decision in FEIS). The Havasupai Tribe, however, contends that this eval-

---

15. Plaintiffs' assertion that the process was used to justify a decision already made is unsupported as demonstrated by the vast amount of time and effort spent by the Forest Service in preparation of the EIS. It must be noted that the Plan of Operations that was first presented to the Forest Service was not the Plan that came

out. The Forest Service required several modifications, including the realignment of a power line, the redesigning of the surface water diversion configuration; a modified haul route, and incorporation of a wildlife habitat. *See* V.1A–D.6–P.924–25.

uation was conducted in a manner contrary to law and the agency findings regarding this issue were arbitrary and capricious. The court disagrees.

The record demonstrates that until May 1986, plaintiffs never raised an issue regarding the religious or cultural value of the mine site. The record reflects that religious concerns were considered by the Forest Service in its analysis even though the plaintiffs did not bring the matter up until late in the administrative process and, even then, in a manner that made it difficult for further analysis. The record indicates that mining exploration activities commenced at the site in March 1977. V.4B–D.215–P.4665. Activities included a ground magnetic survey and a gravity survey. *Id.* Exploration drilling began at the site in 1978, and a total of 38 holes were completed between the summer of 1978 and the spring of 1985. *Id.* at P.4665–66. In 1979, the Canyon Mine project area was investigated by archaeologists from Northern Arizona University in connection with exploration drilling. V.2C–D.62–P.2096. For eight years all exploration activity and archeological work occurred without comment or expressed opposition by the Havasupai regarding their religious concerns. V.3D–D.186–P.3918.

After nearly a decade of exploration and other activities, EFN filed its Plan of Operations in late 1984. A review of the contact with the Havasupai Tribe and its legal counsel is of benefit in the determination of this issue. In November 1984, the Forest Service sent the Havasupai and some 1700 others a letter requesting comments on EFN's proposal. V.2C–D.62–P.2005. The proposal was also heavily publicized. *See id.* at P.2037–70. The record fails to reflect that any religious concerns were raised by the Havasupai Tribe at this time.

In November of 1984, Abajo Archaeology began a preliminary archaeological survey of the area. V.2C–D.62–P.2100. The purpose of the archeological survey was to investigate the cultural-historical background of the project area. *Id.* at P.2102. By letter dated January 18, 1985, the Forest Service notified the Havasupai Tribe of Abajo's application to the Forest Service to conduct a more complete archaeological investigation of the mine site. V.2A–D.37–P.1414. The letter requested that the Havasupai contact the Forest Service within thirty days to "discuss their interest, including ways to avoid or mitigate potential harm or destruction of this site." *Id.* By letter dated February 15, 1985, Margaret Vick responded to the January 18, 1985 letter. *Id.* at P.1416. The letter indicated that "the Tribe wishes to consult with the Forest Service prior to issuance of the Permit to Abajo Archeology." *Id.* The letter also indicated that the Havasupai Tribe objected to the Forest Service's issuance of a permit until such consultation was completed. *Id.* By letter dated April 8, 1985, the Forest Supervisor responded to Ms. Vick's letter. He stated in part:

In our [January 18, 1985] letter we sought comments from the Havasupai to assist us in determining if either of these sites had religious or cultural significance for the Tribe. We feel that concerned Indian tribes should function as advisors to our decision-makers and that input from the tribes can be used in determining if a project should proceed as planned or should be modified in some way. Thus, we further sought to determine if the Havasupai Tribe desired to meet with the Forest Service to discuss measures which might mitigate potential harm to the sites.

*Id.* at 1417. The letter notes that the applicable regulations require thirty-day notice to affected tribes and further acknowledges Ms. Vick's February 15, 1985 letter. The letter notes that it had been over eighty days since the Forest Service notified the tribe and that several unsuccessful attempts were made to contact Ms. Vick. *Id.* Further, the letter requested a meeting to discuss mitigation measures. *Id.* Finally, the letter notes that the Forest Service had received repeated inquires from Abajo Archaeology on its permit and that the Forest Service would proceed with issuance of the permit "unless we have heard from you within two weeks of your receipt of this letter." *Id.* at P.1417. The record fails to indicate a response to this

inquiry by the Havasupai. The Havasupai argue that there is no statutory duty to respond. The court agrees. However, "it is still incumbent upon intervenors who wish to participate to structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' positions and contentions. This is especially true when the intervenors are requesting the agency to embark upon an exploration of uncharted territory ..." such as Indian religious beliefs. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 553, 98 S.Ct. 1197, 1216, 55 L.Ed.2d 460 (1978). The April 8, 1985 letter is indicative of the Forest Service's efforts to obtain information from the Havasupai concerning the religious and cultural significance of the Canyon Mine site and to solicit suggestions which might mitigate potential harm to the site.[16] By memo dated April 23, 1985, the Forest Supervisor indicated that it had received no response to its April 8, 1985 letter to Ms. Vick and that the permit should be issued. V.3A–D.94–P.2896. In May of 1985, the Forest Service issued a permit to Abajo Archaeology. The record fails to indicate any Havasupai objection to this activity or any suggested interference with their religious and cultural beliefs.

The scoping process officially began on April 30, 1985, with the publishing of the notice of intent to prepare an EIS. V.1B–D.3–P.487. The Forest Service solicited comments to help define the issues to be considered in the draft EIS. A scoping meeting was held on May 15, 1985, to define the issues for the draft EIS. *Id.* Prior to the official scoping period, on March 13, 1985, Joe Sparks wrote a letter (which has been characterized by the plaintiffs as a "scoping letter") to Mr. Lund. V.3A–D.94–P.2891. The letter did refer to "sacred" springs in the context of the groundwater aquifer of the area. *Id.* The letter did not raise any issue of the religious significance of the Canyon Mine site itself. It is difficult to understand why plaintiffs

were able to reveal this religious issue and not reveal any religious conflicts occurring at the mine itself.

In March of 1985, EFN representatives traveled to Supai Village and met with the entire Havasupai Tribal Council over a period of two days. EFN representatives described in detail the location of the mine site, the preceding decade of exploration work at the site, and the proposed activities of EFN. V.4B–D.215–P.4533–34 (Intervenor's Reply to Statement of Reasons of Various Appellants Opposing Approval of EFN Plan of Operation); V.2B–D.43–P.1548–52 (Affidavit of Brad Doores). Present at the meeting were the Tribal Council, EFN representatives; John R. Adams, Chairman of the Board, Robert M. Steele, mining engineer, and Brad Doores. *Id.* at P.1548. The affidavit of Mr. Doores indicates that Mr. Adams described the location of the proposed mine site and described the extent of the surface disturbance at the site. *Id.* at P.1549. Mr. Steele asked if anyone from the council had any questions. *Id.* at P.1550. Though questions were raised, no issues were raised during the meeting concerning the religious or cultural significance of the mine site. *Id.* at P.1550–52.

The record indicates that the Havasupai Tribe was provided with a regular opportunity to participate in the NEPA process and stay abreast of the mining proposal and raise any issues of concern to it. *See, e.g.,* V.3A–D.94–P.2855–56 (Memorandum in Opposition to Stay of EFN Mining Plan of Operation); *Id.* at P.2903 (groundwater report); *Id.* at 2904 (radiological assessment); *Id.* at 2917 (groundwater monitoring program).

A letter from the Forest Supervisor on December 5, 1985, to Ed McElwain, Tribal Planner, is indicative of the manner in which the NEPA process was conducted. *Id.* at 2917. The letter states:

The draft environmental impact statement for the Canyon Mine proposal will

---

**16.** Plaintiffs contend that there is a distinction between approval of an excavation permit and approval of the plan of operations. The contacts concerning the excavation permit are in-

dicative of the Forest Service's effort to gain information from the Havasupai and of the plaintiffs' failure to provide such information.

be available for public distribution soon. Comments of the Havasupai Tribe, received in response to our previous letters, have been incorporated into the analysis. At this time, we ask if any additional issues or concerns have surfaced since your last correspondence to us, that should be addressed in the environmental impact statement before the initial printing.

*Id.* The record fails to reflect any response to this letter or any additional concerns by the Havasupai Tribe prior to the publishing of the draft EIS in December of 1985, and released to the public in February of 1986.

The draft EIS notes that "no specific sacred sites at the mine site had been identified near the mine site or any of the proposed ore haul routes." V.1A–D.1–P.124. The Chief of the Forest Service noted and the court agrees that: "There were several points in time when it would have been logical for the Havasupai to have objected to the disturbance of the Canyon Mine Site, yet such objections were not made." V.3D–D.186–P.3918 (Decision of the Chief re: Request for Stay of Administrative Decision). Plaintiffs contend that it is sacrilege to tell about their religion and that they did not think it would be of any value. Regardless of the reason for the plaintiffs' failure, it further supports the absence of a record on the religious concerns during the NEPA process.

By letter dated May 12, 1986, comments on the draft EIS were made on behalf of the Havasupai. V.1B–D.4–P.766 (Appendix 6 to Final EIS). This letter contained the first mention by the Havasupai that the mine site had religious significance. The substance of those comments were:

Traditional camps and burial sites are located within the proposed mine area which are sacred to the Supai.

Detailed identification of the religious, cultural and ceremonial significance of the site would be considered sacrilege by the Tribe. However, in the Tribe's effort to protect this site they have authorized us [Sparks & Siler] to disclose the following information:

The proposed mine site lies in the path of the Coconino Kachina who is sacred to the Supai and is the Guardian of the Canyon for the Hopi.

The mine site also lies across the Red Paint and Salt Trails which are sacred to the Supai and which were recognized as such by Congress in the Grand Canyon Enlargement Act. . . .

*Id.* The letter also states that AIRFA required that the no-action alternative should be implemented. *Id.* at P.766. These general claims came after a substantial period of dialogue had occurred between the parties.[17]

The Forest Service received a second set of comments from Vice Chairman Alfred Hanna dated May 30, 1986. However, these comments did not mention any religious significance of the mine site. V.3A–D.94–P.2928.

The issue concerning the religious significance of the Canyon Mine site was ultimately brought to the attention of the Forest Service. There is no statute, case law or other authority that requires the Forest Service to accept any comments or statements at face value. Consistent with the policy of AIRFA and its obligations under NEPA, the Forest Service immediately tried to develop additional substantive information concerning each of the comments so that they could be considered in the administrative process. The Administrative Record reflects that the Forest Service pursued efforts to gain additional information on three fronts. *See* V.2A–D.37–P.1164–68 (Responsive Statement for Canyon Mine Appeal). First, the Forest Service contacted the Havasupai for more information. Second, the Forest Service contacted Dr. Euler, an anthropologist long associated with the Havasupai for his views. Third, the agency researched the available literature.

---

17. The comments provided little substantive information to the Forest Service. Compliance with CEQ Regulations requires that comments shall be "as specific as possible." 40 C.F.R.

§ 1503.3. It is of some significance to compare the detailed comments the Havasupai Tribe gave on their groundwater concerns with the initial expression of their religious concerns.

The Forest Service first contacted the Havasupai by letter dated June 11, 1986. V.3A–D.94–P.2939. The letter is important in several aspects. The letter notes the surprise of the Forest Service, since no one had made any reference to such an issue during the scoping process or during periodic consultations with the tribe. *Id.* It goes on to state: "Nevertheless, we fully appreciate the significance of your comment and wish to begin working with the Tribe immediately to identify any religious or cultural sites which might be affected by development of the mine or associated haul routes so that any impacts can be fully evaluated in the final EIS." *Id.* The Forest Service again requested an immediate visit to the mine site and noted that additional information was "absolutely necessary to evaluate potential impacts and to plan avoidance or mitigation measures which will protect tribal religious freedoms and respond to your concerns." *Id.*[18] The letter further noted that it was important to proceed quickly, and requested that the mine visit take place within two weeks. *Id.* This letter is indicative of the Forest Service's effort to gain information on the Havasupai religious concerns and to confer about those concerns in the context of mitigation and protection of the Tribe's religious freedoms.

The next contact is a letter dated June 26, 1986, by Wayne Sinella to the Forest Supervisor. V.3A–D.94–P.2940. The letter requested an additional sixty days to respond to the June 11, 1986 letter asking for information on the religious significance of the Canyon Mine site.

The Havasupai had agreed to meet with the Forest Service at the Canyon Mine site, but apparently cancelled the meeting. By letter dated July 2, 1986, the Forest Supervisor wrote to Mr. Sinyella regarding the Tribe's cancellation of the joint inspection at the Canyon Mine site. *Id.* at P.2941; *see* V.1B–D.3–P.472. The letter notes that the visit needed to be concluded within the next 14 days so that the information could be included in the final EIS. V.3A–D.94–

P.2941. The record fails to reflect any response to this letter or that any joint inspection at the Canyon Mine site occurred.

By letter dated August 1, 1986, Mr. McElwain gave notice to the Forest Supervisor that the last comments that the Havasupai would make for inclusion in the final EIS would be mailed shortly. *Id.* P.2942. By letter dated August 4, 1986, the Havasupai did submit three comments, including one entitled "Determination of Impacts to Religious and Cultural Resources." *Id.* at P.2944, 2948. There, the Havasupai alleged that the process used by the Forest Service has been faulty. *Id.* at P.2948. The Havasupai allege that other members should have been contacted and that the Forest Service should have made more of an effort to work for a mitigation. *Id.* The Forest Service tried to elicit information from the Tribal Chairman, the Tribal Planner, legal counsel, and the Tribal Council. These were the logical persons to contact. The letter relating to "Additional Comment on Canyon Mine EIS" while attacking the process of the Forest Service, did not provide any additional substantive information on the religious concerns of the Havasupai. The August 4, 1986 letter was specifically addressed by the final EIS in a special "Addendum to Appendix G." V.1B–D.4–P.872.

In addition to contacting the Havasupai directly, the Forest Service contacted Dr. Robert Euler with respect to the Havasupai's religious concerns expressed in their May 12, 1985 comments. V.4B–D.215–P.4671, 4674 (Intervenor's Reply to Statement of Reasons of Various Appellants Opposing Approval of EFN Plan of Operation). Dr. Euler's knowledge of the Havasupai was based upon some thirty years of experience working with and studying the Tribe, including testifying on behalf of the Havasupai before the ICC. Dr. Euler met with the Forest Service in Williams, Arizona, and spoke with Forest Service representatives on the telephone. *Id.* at P.4673.

---

**18.** The Havasupai assert that there can be no mitigation and no compromise. They do not want any mining to occur at the Canyon Mine site or in the area of the Grand Canyon. *E.g.,* V.3D–D.176–P.3747; V.2C–D.62–P.1929, 1934, 1963; V.2A–D.37–P.1333.

Dr. Euler was asked about the concerns expressed in the May 12th letter. Dr. Euler was unable to provide any information that would confirm that a conflict existed between the mine and any specific Havasupai religious practices or sites. *Id.* at P.4677–80. Dr. Euler acknowledged that "[i]t is possible that facts concerning certain religious or cultural practices and sites of the Havasupai may exist but are not known to me." *Id.* at P.4674. Plaintiffs dispute Dr. Euler's knowledge. Plaintiffs claim to be the only real experts on their religion. This is difficult to dispute. However, plaintiffs failed to provide sufficient information or identify specific religious areas at the Canyon Mine site. Plaintiffs protest the fact that Dr. Euler's participation was not given more prominent attention in the final EIS. The final EIS, however, notes that the Indian experts were only one among three sources each of whom failed to identify "specific Indian sacred or religious sites ... near the mine site." V.1B–D.3–P.651–52; V.1B–4–P.771. The plaintiffs requested disclosure of this Indian "expert." V.2A–D.30.P.1090; *see* 40 C.F.R. § 1502.17. The Record indicates that Dr. Euler did not play a major role in the EIS preparation. His opinion ultimately proved to be consistent with the plaintiffs' failure to identify specific religious sites at the Canyon Mine site. The failure to identify Dr. Euler earlier in the this NEPA process does not constitute a defect in the EIS preparation which would require preparation of a new EIS or a supplement thereto.

The last avenue the Forest Service pursued to obtain additional information on the Havasupai religion as it related to the Canyon Mine site (the May 12, 1986 letter) was a review of the available literature. This information did not appear particularly useful in confirming the Havasupai's claims. *See* V.2A–D.37–P.1160, 1336–1405 (Responsive Statement for Canyon Mine Appeal Exh. 7).[19]

The Forest Service's efforts were documented in the final EIS which provides:

The potential impact of the Canyon Mine on Indian religious sites and practices was considered in the DEIS in conjunction with a general analysis of impacts on American Indians. Comments on the DEIS by the Hopi and Havasupai Tribes alleged that religious sites and practices would be adversely affected by the Canyon Mine, a concern which was not raised by the Tribes during scoping or earlier consultation with the Tribes. Based on those comments, and continuing consultation with the affected tribes, the Forest Service has added Indian religious concerns to the list of issues evaluated in detail by the EIS. The text of the FEIS includes an expanded discussion of Indian religious sites and practices in the affected area. The Forest Service has also requested a meeting with tribal representatives at the proposed mine site to identify any specific sacred sites that might be disturbed by mining activity. To date, neither Tribe has committed to a visit to the mine site. Consultations with the Tribes regarding religious concerns will continue beyond the completion of the NEPA process. V.1B–D.3–P.472.

The final EIS continues:

In completing this environmental impact statement, the Forest Service has attempted to identify Indian concerns, both religious and environmental, through the formal scoping process and through informal consultation with tribal leaders.

The Hopi and Havasupai Tribes have suggested that sacred religious sites, including ruins, graves and hunting areas exist at or near the mine site and haul routes. However, consultation with the Tribes and experts on Indian religious sites and practices as well as archeological inventories have failed to identify any specific Hopi or Havasupai sites of sacred or religious significance near the proposed mine site. *Id.* at P.608.

---

**19.** Plaintiffs claim that the review was not thorough in light of the failure by the Forest Service to examine Dr. Euler's previous work (*see Plaintiffs' Responsive Brief*, Ex. A). The record, however, reflects that a 1974 edition of this work was considered and included in a Bibliography of materials on the Havasupai. *Id.* at P.1404; V.2A–D.37–P.1160.

Finally, under the section Environmental Impacts on Indian Religious Concerns, the final EIS provides:

After communications and consultation with Hopi and Havasupai Tribal leaders and experts on Indian religious sites and practices as well as an archeological investigation of the mine site, no specific Indian sacred or religious sites have been identified near the mine site. The Tribes maintain that Indian religious interests will be adversely affected but have not identified specific sites which are threatened. In addition, a review by an expert in Indian religious sites and practices has failed to identify sites that would be affected by the proposed action. Consultation with tribal leaders will continue. *Id.* at P.651-2.

The Record of Decision again reflects the Forest Service's findings, wherein it sets forth:

"[T]he current level of religious activity is not expected to be curtailed by any alternative nor will access to any known religious sites or area be restricted. Although, there is no physical evidence of Indian religious activity at the mine site itself, the Havasupai have recently stated that sacred camping and burial sites are present in the general area north of Red Butte, and perhaps at the mine site itself. However, the Havasupai Tribe refuses to disclose the location of the sites. The Havasupai Tribe has also recently stated that the general area around the mine is important to the tribes' religious well-being because it lies within a sphere of existence or a continuum of life extending generally from the Grand Canyon to Red Butte." V.1B–D.6–P.923.

In sum, the Forest Service responded directly to the comments in the draft EIS regarding Havasupai religious concerns contained in the May 12, 1986, and August 4, 1986 letters in the final EIS and Record of Decision.

The EIS process closed and the final EIS and Record of Decision were released on September 26 and 29, 1986. The Forest Service, consistent with its statements in the final EIS, pursued the matter with the Havasupai Tribe. On August 28, 1986, representatives of the Forest Service met with members of the Havasupai and Hopi Tribes in Tusayan, Arizona. *See* V.3A–D.80–P.2705. By letter dated September 8, 1986, Joe Sparks summarized the meeting and the concerns of the Havasupai Tribe. *Id.* The letter states, in part:

The Havasupai Tribe has informed you that the Canyon Mine site is a sacred religious site within a larger sacred area. For the reasons set forth in this letter the Tribe cannot, without risk of religious sacrilege and interference with and disruption of the present and future practice of their religion, explain anymore (sic) than what was told to Mr. Lund and Mr. Chacon last week.

The site is within a large area south of Red Mountain that includes the path of the Cohonino Kachina and the sacred Red Paint Way and sacred Salt Way. The proposed mine will destroy the continuum of life which is indispensable and central to the Havasupai religion.

The site is also is very near the burials of Havasupai Tribal members, whose living relatives participated in the burial ceremonies. *Id.*

The September 8, 1986 letter notes what appears to be a newly stated religious concern with focus upon the Havasupai "continuum of life". The administrative appeal process provided the plaintiffs additional opportunity to make their religious concerns known to the Forest Service and EFN.

Plaintiffs contend that there is no statutory deadline for publication of the final EIS and that the Forest Service should have done an extensive study on the Havasupai religious claims as done in *Lyng.* In *Lyng,* however, the Indians made it perfectly clear that the proposed actions would infringe on their religious beliefs and gave information that led to the study. A determination of the need for such a study would be in the agency's discretion. Under the circumstances of this case, the Forest Service's conduct was reasonable. Plaintiffs who claim to be the only experts on the Havasupai religion would not speak of

their religion directly or reveal details concerning the manner in which the proposed mining activity would interfere with their religious beliefs and or practices. V.3B–D.122–P.3142 (Havasupai Tribe Affidavit). The Forest Service studied the effects of the mining plan on American Indians in general. It was not unreasonable to conclude that a further study would have been unproductive. Accordingly, it was not an abuse of the agency's discretion not to conduct further studies under the facts and circumstances of this case.

Finally, by letter dated September 24, 1986, the EFN responded to the Havasupai Tribe's concerns raised in the meeting and the September 8th letter. V.3A–D.94–P.2953. EFN requested specific information on the religious practices so that it could evaluate the claimed conflict and try to avoid or lessen any possible impact. The record fails to indicate a response to this letter.

It is clear from this analysis, that the Forest Service complied with NEPA and took the required "hard look." The Havasupai continuously claim that they are the only ones that know their religion, yet the record clearly shows that they were not forthcoming on the subject during the scoping process or the comment period leading up to the publication of the final EIS, nor would they identify specific sites of religious significance. The Havasupai Tribe argues that the Forest Service did not make a sufficient effort, but the record reflects that the plaintiffs did not respond to numerous attempts for more specific information.

The Supreme Court has stated that:
[A]dministrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that "ought to be" considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated on the grounds the agency failed to consider matters "forcefully presented."
*Vermont Yankee Nuclear Corp.*, 435 U.S. 519, 553–54, 98 S.Ct. 1197, 1217, 55 L.Ed.2d

460 (1978). The issues raised in the May 12, 1986 letter resemble the types of cryptic references that were viewed unfavorably in *Vermont Yankee*. The court recognizes that the nature of the Havasupai religion is inherently a personal and secret issue. However, the law requires revelation in exchange for further recognition, consideration, and mitigation. The Forest Service took every reasonable step to develop these comments and discussed each in the final EIS. The Forest Service agency repeatedly sought clarification of plaintiff's comments. However, the Administrative Record reflects that the Havasupai declined to participate or structure their participation in a meaningful manner during the administrative action. Accordingly, the plaintiffs cannot complain that the agency's consideration of their religious concerns was inadequate.

The court finds and concludes that the Forest Service took appropriate action under NEPA and the policy of AIRFA to investigate and consider the religious concerns of the Havasupai Tribe. The Forest Service complied with the applicable laws and did not make any findings that were arbitrary or capricious under the facts and circumstances of this case.

### C. Ground Water and Surface Hydrology Analysis

■ Plaintiffs allege numerous deficiencies regarding the hydrologic and hydrogeologic analyses contained in the EIS. Plaintiffs argue that the EIS should be supplemented to correct these deficiencies. The court disagrees and finds and concludes that the agency took appropriate measures to investigate and consider these issues.

Plaintiffs contend that the "unique and special geological conditions of the Canyon Mine area were not considered in the water analysis." *Plaintiffs' Opening Brief,* at 81. The record clearly reflects that the particular geological conditions of the Canyon Mine area were thoroughly considered in the water analysis. The Forest Service retained a consulting hydrologist who had primary responsibility in coordinating this

area of the EIS. *See* V.1B–D.3–P.657. Appendix "F" to the draft EIS is the report on "Groundwater Conditions" for the Canyon Mine region prepared by Errol L. Montgomery & Associates, Inc. ("EMA"). V.1A–D.2–P.383–460. The "Groundwater Conditions" report includes extensive considerations of hydrogeologic conditions, structural features and characteristics of breccia pipe formations, water well data from over 150 existing wells and exploration bore holes in the Canyon Mine site area, groundwater circulation and chemical quality of groundwater, and a groundwatering monitoring program. The EIS discusses actual data relating to previous drilling in the Canyon Mine site. V.1A–D.2–P.404–05, 432–36 (table 1). The EIS notes the specific nature of the breccia pipe deposits. *Id.* at P.402–03. The report relies on five previous investigations by other experts concerning the hydrogeologic conditions on the Coconino Plateau on the south rim of the Grand Canyon. *Id.* at P.391. The EIS reflects that the Havasupai received portions of the groundwater report and by letter dated September 10, 1985, EMA further explained the results of the chemical analyses to Mr. McElwain, Tribal Planner for the Tribe. *Id.* at P.452–56.

With respect to surface water, Appendix "D" to the draft EIS is a report on "Downstream Hydrologic Impacts" by Dr. Charles Leaf. V.1A–D.2–P.312–37.

The Record reflects that these reports and the draft EIS went to numerous federal, state, and local agencies, including the EPA and the Department of the Interior. *Id.* at P.153–54.

Plaintiffs contend that the Forest Service failed to consult with the United States Geological Survey, however, the U.S.G.S. is a subagency of the Department of Interior

and the Department did receive and comment upon the EIS. Plaintiffs also contend that federal and state nuclear regulatory agencies should have been consulted. Uranium mining had been exempted from regulatory requirements of these agencies. *See Reporter's Transcript of Proceedings*, vol. 7, at 42–43 (Jan. 10, 1989); *id.*, vol. 10, at 27–28 (Jan. 13, 1989). The EPA was consulted and it had responsibility to deal with the environmental concerns (i.e., leaching) raised in the Plan of Operations. The court finds and concludes that the Forest Service circulation of the Plan was reasonable and appropriate.

The Havasupai and their counsel submitted numerous comments to the Forest Service concerning the surface and groundwater reports. V.1B–D.4–P.767–69, 778, 872–73. The Forest Service responded in detail to every comment submitted by the plaintiffs. *See id.* at P.772–73, 779–80, 875. The Forest Service transmitted plaintiffs' comments to the consulting firms for review and response. EMA supplemented its earlier report specifically responding to plaintiffs' contentions. V.2B–D.43–P.1616–53. The final EIS contained an expanded discussion on potential groundwater impacts. V.1B–D.3–P.472.

After the Record of Decision was published, the Havasupai Tribe continued to challenge the groundwater and surface water analyses. Dr. David K. Kreamer, an expert hydrologist and consultant to the Havasupai Tribe, gave an opposing viewpoint on the studies previously done on behalf of the Forest Service. *See* V.2B–D.59–P.1811–12. Dr. Kreamer contended during the administrative process that this information was not sufficiently site related. *See id.* The Forest Service expert, EMA, directly responded to those contentions. V.4C–D.234–P.4921–26.[20] There

---

20. The EMA report states: "The essential information is available for assessment of potential for groundwater contamination from mine operations, and results of extremely conservative analyses indicate that this potential is low." *Id.* at 4922.

The report also concludes: "For environmental impact investigations, technical assumptions are combined with available data to project impacts. In hydrogeologic investigations, as for other sciences that evaluate natural conditions in the field, the technical assumptions are selected to provide conservative estimates with a sufficient measure of safety regarding conditions that are not known precisely. For the Canyon Mine groundwater investigation, extremely conservative assumptions were used to prepare quantitive estimates for potential im-

was no need to consider the specific geological information regarding breccia pipe formations and the aquifer underlying the site.

Plaintiffs also argue that there are no studies in the EIS which indicate that a single monitoring well will detect contamination from the mine site. V.1B–D.3–P.778. This contention did receive substantial consideration by the Forest Service. *See* V.1B–D.3–P.530, 649; *Id.* D.4–P.764–65, 773, 796; V.2A–D.37–P.1151; V.2D–D.64–P.2325–26; V.4B–D.214–P.4259–61, 4266–67, 4272; V.4C–D.234–P.4919–20. With regard to the direction of the flow of water, the Forest Service expert responded that "[t]he monitoring/supply well would be within the area where seepage would encounter the groundwater table, regardless of the direction of movement of the seepage after it mixes and is diluted with the groundwater. The precise direction of groundwater movement in this aquifer at the mine site is not required to establish an effective monitoring program to detect potential contamination from mining operations." V.4B–D.214–P.4272. "The monitor/supply well is located near enough to the breccia pipe to be within the basal area of the inverted cone of percolation. Therefore, the well is located properly." V.2A–D.28–P.1001.

The Forest Service clearly addressed the capability of the monitoring well to detect contaminates in the Canyon Mine area. The Forest Service expert concluded that "the well and existing pump assembly are capable of creating a cone of depression in the groundwater table which would intercept potential contaminants and thereby provide both a monitoring capability for early detection and a facility for reclamation of potentially contaminated groundwater." V.4B–D.214–P.4267.

Plaintiffs also contend that in the event that contamination is detected at Havasu, Blue and Indian Garden Springs, it would be too late for reclamation. The Forest Service expert, EMA, made it clear that the on-site monitoring of the well was not intended to comprise the sole reclamation effort in the unlikely event of groundwater contamination: "Additional wells might be required to conduct proper reclamation. However, it is neither standard nor good practice to design and implement a reclamation system before contamination is detected...." V.4C–D.234–P.4919.

Plaintiffs further argue that the exposure of the radioactive materials in the naturally occurring rock will increase the leaching process and contamination into the groundwater. The approved plan of operations calls for waste materials to be put back into the mine site after completion of the mining operations. B.1–D.1–P.56. It is unclear what deficiency plaintiffs allege. The Forest Service discussed this issue in detail. V.1A–D.2–P.426–27; V.1B–D.3–P.647–50; V.1B–D.4–P.772. It is undisputed that some leaching is occurring now, as well as in the past. V.1A–D.2–P.426–27. Some leaching is likely to occur after mining. *Id.* at P.426–27. Apparently, the amount of leaching will be reduced since EFN will mine and remove the richest mineralized rock. *See id.* at P.426–27. This matter has been fully considered by the Forest Service.

■■■■ In conclusion, as the administrative process progressed, EMA responded and supplemented its reports to various issues raised by the Havasupai Tribe and others. Plaintiffs are basing their arguments upon disagreements among experts. A disagreement among experts does not invalidate an EIS. *See Cady v. Morton,* 527 F.2d 786, 796 (9th Cir.1975) (citing *Life of the Land v. Brinegar,* 485 F.2d 460, 472 (9th Cir.1973)). An EIS does not have to resolve all contentions so long as it sufficiently identifies them so that the decision-maker can make an informed decision. *Warm Springs Dam Task Force v. Gribble,* 565 F.2d 549, 554 (9th Cir.1977). As to the issues raised by the Havasupai Tribe, they were examined in detail, responded to, and resolved consistent with the NEPA

pact. Results of construction and testing of the new monitor/supply well at the Canyon Mine have provided valuable site-specific data that has confirmed many of our previous assumptions for the site." *Id.* at P.4921.

process—nothing more is required under NEPA. The fact that plaintiffs disagree with the result is insufficient to show that there has been a deficiency in the NEPA process.

### D. Disposal of Radioactive Waste

Lastly, plaintiffs object to the final EIS on the grounds that it impermissibly bifurcates the project by only addressing the mine, and not considering the disposal of radioactive waste generated by the mine.

■■■ Plaintiffs' objection could be construed several ways. First, plaintiffs could be concerned with the disposal of high-level nuclear wastes generated by end users of the mine's products. The final EIS addresses this issue at V.1A–D.3–P.487. The Forest Service determined that questions regarding the off-site generation and disposal of high-level nuclear waste would not be addressed by the EIS because those concerns were too far removed from the project. The court agrees. There is no indication that the production of such waste will have any impact on the mine or surrounding areas. Furthermore, projects generating high-level nuclear waste would have to comply with a broad range of applicable regulations, including the NEPA.[21]

■■■ Plaintiffs' objection could also be construed as a concern over the manner of disposing of uranium ore extracted from the mine with too low an ore content to economically transport for processing. The final EIS proposes either hauling such ore to a previously approved location, or disposing of it underground in the mined-out workings. V.1B–D.3–P.514. Because it is unclear whether plaintiffs are objecting to either of these disposal techniques, the court finds it appropriate to address the Forest Service's analysis of both.

The only objection to off-site disposal on the record is a letter containing comments on the draft EIS sent by The Hopi Tribe to

Mr. Lund on April 30, 1986. *See* V.1B–D.4–P.756. In its response to the objection, the Forest Service concluded that the possibility of off-site low-level ore disposal was remote, and that if it ever became necessary, an amendment to the Plan of Operation, subject to review under NEPA, would have to occur before a site could be chosen. V.1B–D.4–P.764.

The court finds and concludes that the Forest Service's decision regarding off-site disposal is reasonable. Furthermore, plaintiffs will have ample opportunity to protect their interests should the issue arise in the future by participating in renewed review under NEPA.

Regarding disposal of low-level ore by replacement in mined-out workings, the Havasupai commented on the DEIS as follows:

> The Groundwater Report ignores the fact that the proposed reclamation plan calls for the mine ore and contaminated materials to be dumped into the mine shaft after mining operations cease. There is no information on the effects from leaching from these contaminated materials, nor is there any information on the flow of contaminated water between aquifers after mining operations cease and pumping from the mine shaft is stopped.

V.1B–D.4–P.767. The Forest Service responded that:

> The comment that mine ore and contaminated materials will be dumped into the mine shaft after mining operations cease is not accurate. Much of the rock removed from the breccia pipe will be barren or slightly mineralized waste rock. Uranium ore will be removed and trucked to a distant processing plant. During post-mining reclamation operations, only the barren or slightly mineralized waste rock may be replaced into the mine. The result will be to replace na-

---

**21.** Plaintiffs' reliance on *City of Rochester v. United States Postal Service,* 541 F.2d 967 (2nd Cir.1976), and *Alpine Lakes Protection Society v. Schlapfer,* 518 F.2d 1089 (9th Cir.1975) is misplaced. In those cases, no EIS had been prepared. In this case, an extensive EIS was pre-

pared, but the scope was limited in the sense that the issue of disposal of high level nuclear waste material was not determined to be sufficiently related to the Canyon Mine site to require further discussion.

tive high-grade uranium ore with the native barren or relatively non-mineralized waste rock. Mining operations may promote oxidation and increase the potential mobility of radioactive minerals. However, the quantity of radioactive minerals remaining to be leached will be reduced significantly below pre-mining levels from the removal of high-grade ore. If perched groundwater recharge due to rainfall and snowmelt drains through the sealed Canyon Mine shaft after reclamation, concentrations of radioactive minerals from the waste rock are anticipated to be small, approaching the range of monitoring instrument error, even in the unlikely event that such minerals eventually reach the referenced springs....

V.1B–D.4–P.772. It should be noted that the ore will be hauled to EFN's licensed mill at Blanding, Utah, which has a daily design capacity that exceeds the scheduled ore production of the Canyon Mine site. It is estimated that the Canyon Mine site will take up only 10% of the mill processing capacity. V.1B–D.3–P.481. Plaintiffs contend that the impacts in Blanding, Utah, should have been considered by the Forest Service. *See* 40 C.F.R. § 1508.25. The Forest Service's decision not to include these distant impacts in this site specific examination was reasonable. In addition, the final EIS also contained an expanded discussion of subsurface water issue in response to the Havasupai's concerns. *Id.* at 645–50.

The court finds and concludes that the Forest Service made a reasonable determination that the impacts of this proposal on the issue of disposal of high-level nuclear waste was "too far removed" from the Canyon Mine. Furthermore, the Forest Service's plan adequately deals with the disposal of low-level ore-bearing material, whether it is to be replaced in mined-out workings or ultimately removed off-site.

*E. Cumulative Impacts*

[47] Plaintiffs final alleged NEPA deficiency concerns the Forest Service's treatment of cumulative impacts. Plaintiffs contend that the Forest Service refused to study the cumulative impacts of past, present, and reasonably foreseeable uranium mining in the area and that the Forest Service erred in not preparing a regional EIS. The court disagrees.

The CEQ regulations require "cumulative actions" to be considered. 40 C.F.R. §§ 1508.7 and 1508.25. The final EIS clearly sets forth the Forest Service's approach to analyzing cumulative effects:

> The potential for uranium mining on the Tusayan Ranger District on the Kaibab National Forest south of the Grand Canyon, is uncertain and problematical. While literally thousands of mining claims have been filed in the Tusayan area, this has little relation to the number of mines that may ultimately be developed. There are no known proposed mines other than the Canyon Mine, on the Tusayan Ranger District south of the Grand Canyon. The highly speculative nature of mineral prospecting and exploration, the fact that mining claims are located prior to discovery of a mineral deposit, the current depressed conditions of the domestic uranium market and the highly localized nature of breccia pipe deposits, all contribute to the difficulty in predicting the extent of future uranium developments. Because the exact schedule and location of future mining is not possible to predict, this EIS analyzes potential cumulative impacts by hypothesizing the addition of several new mines in the area, developed concurrently with the Canyon Mine.

V.1B–D.3–P.489. The record reflects that no other uranium mining proposals on the Tusayan Ranger District south of the Grand Canyon were made at the time of the release of the draft and final EIS. V.1A–D.1–P.28; V.1B–D.3–P.483. EFN has acknowledged that it has filed applications to lease state lands for exploration of two sites west of the Canyon Mine site. 2A–D.37–P.1424. Plaintiffs contend that, when considering "cumulative impact," there should be no distinction between exploration and actual mining. While exploration would have some impact on the environment, the speculative nature of mining in the Grand Canyon remains and thus

consideration of exploration alone would not contribute materially to an analysis of the cumulative impacts of other mines in the area. These application leases are not the equivalent of other mines and treatment to the contrary would be speculative. *See id.* at P.1424. The Forest Service is not required to consider purely speculative activities. *See Kleppe v. Sierra Club,* 427 U.S. 390, 410, 96 S.Ct. 2718, 2730 n. 20, 49 L.Ed.2d 576 (1976); *Coalition For Canyon Preservation v. Bowers,* 632 F.2d 774, 783 (9th Cir.1980). The Canyon Mine site only encompasses 34 acres. The Plan of Operations for the Canyon Mine site does not constitute a regional plan of development nor is a regional plan required.

Therefore, the court finds and concludes that the Forest Service's consideration of the cumulative impacts issue was reasonable and appropriate under the facts and circumstances of this case.

### F. Conclusion on NEPA Claims

The EIS for the Canyon Mine site contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences of the Canyon Uranium Mining Proposal. The environmental effects were clearly put before the decisionmakers. The court has examined the record and is satisfied that the action of the Forest Service was appropriate in all respects. The action of the Forest Service in the preparation of its evaluation of the Canyon Uranium Mine Proposal and in responding to the comments of plaintiffs was thoughtful and complete on all issues. The court recognizes the sincerity of the beliefs held by the Havasupai Tribe and the sincerity of the disagreements it has with EFN and the Forest Service, however, the court finds no violations of the National Environmental Policy Act. The Forest Service acted in compliance with the law, the procedures of NEPA, and did not undertake their duties in an arbitrary or capricious manner. Accordingly, judgment shall be entered in favor of the defendants on Count IV of plaintiffs' Complaint.

Based on the foregoing,

IT IS ORDERED affirming the decision of the Chief of the Forest Service approving the modified Plan of Operations for the proposed Canyon Uranium Mine.

FURTHER ORDERED granting judgment in favor of each of the defendants and against each of the plaintiffs on all counts of plaintiffs' Complaint and plaintiffs take nothing thereby.

FURTHER ORDERED vacating the stay in this matter thirty (30) days from the date of the entry of the judgment herein.